**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NATIONAL ASSOCIATION OF MANUFACTURERS, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, and BUSINESS ROUNDTABLE**, Plaintiffs, v. **SECURITIES AND EXCHANGE COMMISSION**, Defendant, **AMNESTY INTERNATIONAL USA, and AMNESTY INTERNATIONAL LTD.,** Intervenor-Defendants. | Civil Action No. 13-cv-635 (RLW) |

**MEMORANDUM OPINION**

Pursuant to the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"), the Securities and Exchange Commission promulgated a rule imposing certain disclosure requirements for companies that use "conflict minerals" originating in and around the Democratic Republic of the Congo ("DRC"). *Conflict Minerals*, 77 Fed. Reg. 56,274 (Sept. 12, 2012) (codified at 17 C.F.R. §§ 240, 249b) (the "Conflict Minerals Rule," "Final Rule," or "Rule"). The plaintiffs in this action—the National Association of Manufacturers ("NAM"), the Chamber of Commerce, and Business Roundtable (collectively, "Plaintiffs")—challenge various aspects of the SEC's Final Rule as arbitrary and

capricious under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, *et seq.*[1]  Plaintiffs

also mount a constitutional attack against both the Rule and Dodd-Frank § 1502, claiming that

the disclosures required by the SEC and by Congress run afoul of the First Amendment.  Finding

no problems with the SEC's rulemaking and disagreeing that the "conflict minerals" disclosure

scheme transgresses the First Amendment, the Court concludes that Plaintiffs' claims lack merit.

Accordingly, upon careful consideration of the parties' briefing and the arguments of counsel,

along with a thorough review of the Joint Appendix the parties relied upon as the administrative

record in this case, the Court, for the reasons that follow, will **DENY** Plaintiffs' Motion for

Summary Judgment (Dkt. No. 14) and will **GRANT** the Commission's and Intervenors' Cross-

Motions for Summary Judgment (Dkt. Nos. 15, 16).

## BACKGROUND

### A.  Statutory and Regulatory Framework

#### 1.  Dodd-Frank Act § 1502

Responding to the national financial downturn, Congress enacted the Dodd-Frank Act on

July 21, 2010, and introduced a broad range of new measures designed to improve the troubled

securities markets.  As relevant here, Section 1502 of Dodd-Frank directed the SEC to develop

and promulgate a rule requiring greater transparency and disclosure regarding the use of

"conflict minerals" coming out of the DRC and its neighboring countries.  Congress believed

that "the exploitation and trade of conflict minerals originating in the [DRC] is helping to finance

conflict characterized by extreme levels of violence in the eastern [DRC], particularly sexual-

and gender-based violence, and contributing to an emergency humanitarian situation."  Dodd-

Frank § 1502(a), 124 Stat. 2213.  In Congress's view, requiring companies "to make public and

---

[1]      Two groups—Amnesty International of the USA, Inc. and Amnesty International Limited
("Intervenors")—were also permitted to intervene on behalf of the Commission.

disclose annually to the Securities and Exchange Commission if the minerals in their products originated or may have originated in Congo" will help "to ensure activities involving such minerals did not finance or benefit armed groups."  156 Cong. Rec. S3976 (May 19, 2010) (statement of Sen. Feingold).  Put another way, Congress concluded that this disclosure scheme was "a reasonable step to shed some light on this literally life-and-death issue," and believed that it would "encourage companies using these minerals to source them responsibly."  156 Cong. Rec. S3817 (May 17, 2010) (statement of Sen. Durbin).

Dodd-Frank added Section 13(p) to the Securities and Exchange Act of 1934.  *See* 15 U.S.C. § 78m(p).  The statute directs the SEC to adopt regulations requiring companies that use "conflict minerals" that are "necessary to the functionality or production" of their products, *id.* § 78m(p)(2)(B), to disclose to the Commission whether those minerals originated in the DRC or an adjoining country, *id.* § 78m(p)(1)(A).  If such "conflict minerals"—tantalum, tin, tungsten, and gold[2]—did originate in the DRC or an adjoining country, then companies must also submit an additional report to the Commission containing a "description of the measures taken . . . to exercise due diligence on the source and chain of custody of such minerals," and "a description of the products manufactured or contracted to be manufactured that are not DRC conflict free." *Id.* § 78m(p)(1)(A)(i)-(ii).   Under the statute, "DRC conflict free" means that a product "does not contain conflict minerals that directly or indirectly finance or benefit armed groups in the [DRC] or an adjoining country."  *Id.* § 78m(p)(1)(D).  The report must also describe "the facilities used to process the conflict minerals, the country of origin of the conflict minerals, and

---

[2]        Both Dodd-Frank and the Final Rule define "conflict minerals" as "columbite-tantalite (coltan), cassiterite, gold, wolframite, or their derivatives," along with any other mineral or derivative that the Secretary of State determines is "financing conflict" in the DRC.  Dodd-Frank § 1502(e)(4), 124 Stat. 2218; *see also* 77 Fed. Reg. at 56,283-56,285.  In their briefs, however, the parties refer to the relevant minerals as the derivatives most commonly extracted from these ores—tantalum, tin, tungsten, and gold.  For simplicity's sake, the Court does the same.

the efforts to determine the mine or location of origin with the greatest possible specificity." *Id.* § 78m(p)(1)(A)(ii).   Notably, the statute additionally requires that any disclosures or reports provided to the SEC under these provisions must be made publicly available on the companies' own Internet websites. *Id.* § 78m(p)(1)(E).

Along with the SEC, Section 1502 also created responsibilities for other federal agencies. For example, the statute requires the Comptroller General to submit regular reports to Congress assessing "the rate of sexual- and gender-based violence in war-torn areas" in and around the DRC, and "the effectiveness of section 13(p) . . . in promoting peace and security" in the DRC and surrounding countries.   Dodd-Frank § 1502(d)(1)-(2), 124 Stat. 2216-17.   In addition, the Secretary of State is required to produce and make publicly available "a map of mineral-rich zones, trade routes, and areas under the control of armed groups" in the DRC and adjoining countries, and must also prepare and submit to Congress "a strategy to address the linkages between human rights abuses, armed groups, mining of conflict minerals, and commercial products." *Id.* § 1502(c)(1)-(2), 124 Stat. 2215-16.[3]

2.   **The Conflict Minerals Rule**

Following the passage of Dodd-Frank, the Commission published its proposed rule a few months later in December 2010.   *See Conflict Minerals*, 75 Fed. Reg. 80,948 (Dec. 23, 2010). During the rulemaking process, the SEC received more than 13,000 comment letters, and it also

---

[3]      Notably, this was not the first time Congress confronted these issues.   Congress previously considered two other bills focused on the illicit minerals trade in the DRC, although neither was ultimately adopted.   One would have implemented a ban on the importation of certain products that contained or were derived from columbite-tantalite or cassiterite originating in the DRC.   *See* Conflict Coltan and Cassiterite Act of 2008, S. 3058, 110th Cong. (2008); Conflict Minerals Trade Act, H.R. 4128, 111th Cong. §§ 6, 7 (2009).   More recently, the Senate considered a bill that, like the statute at issue here, would have required companies using "conflict minerals" to make annual disclosures to the SEC.   *See* Congo Conflict Minerals Act, S. 891, 111th Cong. § 5 (2009).

convened a public roundtable to solicit feedback from interested stakeholders and industry representatives; following the roundtable, the Commission requested additional comments. *See* 77 Fed. Reg. at 56,277-56,278. Ultimately, the SEC adopted the Final Rule (Rule 13p-1) by a 3-2 vote on August 22, 2012, and published its Adopting Release—which spans nearly 100 pages in the Federal Register—on September 12, 2012. *Id.* at 56,274-56,365.

a) ***Overview of the Final Rule***

As set out in the Adopting Release, the SEC's Conflict Minerals Rule can be broken down into three overall steps, which the Court summarizes in turn.

At "Step One," and as a threshold matter, companies must first determine whether they are covered by the Rule's requirements at all. The Final Rule only applies to "reporting" companies—i.e., companies that "file reports with the Commission under Section 13(a) or Section 15(c) of the Exchange Act," 77 Fed. Reg. at 56,287—for which "conflict minerals are necessary to the functionality or production of a product manufactured or contracted by that issuer to be manufactured," *id.* at 56,290.[4] It bears mentioning that the Commission considered extending the Rule's reach farther—observing that the statute "could be interpreted to apply to a wide range of private companies not previously subject to [the SEC's] disclosure and reporting rules," *id.* at 56,285—but ultimately thought the more reasonable interpretation was to limit the Rule's application to reporting issuers. The SEC also considered several other factors bearing on the Rule's scope. As relevant to this case, the Commission concluded that the Rule should not be limited to issuers that directly manufacture products with necessary conflict minerals, but should also reach issuers who contract to manufacture such products; the Commission also

---

[4]     The Adopting Release uses the term "issuers" when referring to entities covered by the Rule. In this Opinion, the Court uses the terms "companies" and "issuers" interchangeably.

declined to adopt any type of categorical *de minimis* exception to the Rule's coverage.  *See id.* at 56,288-56,292, 56,295, 56,298.

After applying these coverage standards, issuers that are subject to the Conflict Minerals Rule must proceed to "Step Two," which requires covered issuers to conduct a "reasonable country of origin inquiry" regarding their conflict minerals.  *Id.* at 56,311.  The Rule does not precisely define what constitutes a "reasonable country of origin inquiry," noting that it can "differ among issuers based on the issuer's size, products, relationships with suppliers, or other factors," and "depend[ing] on the available infrastructure at a given time."  *Id.*  But the Rule does provide some guidance.  The inquiry "must be reasonably designed to determine whether the issuer's conflict minerals did originate in the Covered Countries, or did come from recycled or scrap sources, and it must be performed in good faith."  *Id.* at 56,312.[5]  As explained in the Adopting Release, the Commission would "view an issuer as satisfying the reasonable country of origin inquiry standard if it seeks and obtains reasonably reliable representations"—"either directly from that facility or indirectly from the issuer's immediate suppliers"—"indicating the facility at which its conflict minerals were processed and demonstrating that those conflict minerals did not originate in the Covered Countries or came from recycled or scrap sources."  *Id.*[6]  The Rule also confirms that an "issuer is not required to receive representations from all of

---

[5]     The term "Covered Countries" includes the DRC and its adjoining countries: Angola, Burundi, Central African Republic, the Republic of the Congo, Rwanda, South Sudan, Tanzania, Uganda, and Zambia.  77 Fed. Reg. at 56,275 nn.7-8

[6]     In crafting this approach, the Commission relied upon the due diligence framework issued by the Organisation for Economic Cooperation and Development ("OECD").  77 Fed. Reg. at 56,312.  ("The reasonable country of origin inquiry is consistent with the supplier engagement approach in the OECD guidance where issuers use a range of tools and methods to engage with their suppliers.  The results of the inquiry may or may not trigger due diligence.").  The OECD is an international economic coalition comprised of 34 member countries, including the United States, focused on forging global standards and international agreements on matters of economics, corporate governance, and more.  At the time the Final Rule was adopted, the OECD

its suppliers," emphasizing that the "standard focuses on reasonable design and good faith inquiry." *Id.*[7]  The SEC, instead, expects issuers to take into account "warning signs" and "red flags" suggesting that their minerals may have originated in the Covered Countries, or otherwise "casting doubt" on the source of their minerals.  *Id.* at 56,311-56,312 & n.448.

Depending on the results of a company's reasonable country of origin inquiry, it may or may not be required to proceed to the Rule's third step.   On the one hand, if, through its reasonable country of origin inquiry, an issuer: (1) "determines that its necessary conflict minerals *did not* originate in the Covered Countries or *did* come from recycled or scrap sources," or (2) "has no reason to believe that its conflict minerals may have originated in the Covered Countries or reasonably believes that its conflict minerals are from recycled or scrap sources," then the issuer's tracing obligations end there.  *Id.* at 56,313 (emphasis added).  The Rule simply requires that the issuer disclose its determination to the Commission, briefly describing the scope and results of its reasonable country of origin inquiry on a newly-created "Form SD."  *Id.*  On the other hand, if the issuer: (1) "knows" that its conflict minerals "originated in the Covered Countries and did not come from recycled or scrap sources," or (2) "has reason to believe" that

---

had developed "the only nationally or internationally recognized due diligence framework" on the sourcing of conflict minerals.  *Id.* at 56,281.  The SEC's Adopting Release references—and, in some places, incorporates—aspects of the prior version of the OECD original guidance report, but the current version is available through the OECD's website.  *See* OECD Due Diligence Guidance for Responsible Supply Chains of Minerals From Conflict-Affected and High-Risk Areas (2013), *available at* http://www.oecd.org/daf/inv/mne/GuidanceEdition2.pdf (addressing supply chain management for "tin, tantalum, tungsten, their ores and mineral derivatives, and gold") ("OECD Due Diligence Guidance").   The OECD also separately publishes supplemental guidance on the sourcing of gold.  *See* OECD Due Diligence Guidance for Responsible Supply Chains of Minerals From Conflict-Affected and High-Risk Areas: Supplement on Gold (2012), *available at* http://www.oecd.org/daf/inv/mne/GoldSupplement.pdf.

[7]     As an example, the Commission agreed that "if reasonable inquiry had been made, and if no evidence of [Covered Country] origin has arisen, and if the origin of only a small amount of gold were still unknown, a manufacturer should be allowed to declare that its gold is not from the [Covered Countries] and is DRC conflict free."  77 Fed. Reg. at 56,312 (alterations in original).

its minerals "may have originated in the Covered Countries (and may not have come from recycled or scrap sources)," then the issuer must proceed to the Rule's third step. *Id.*

At "Step Three," issuers must exercise "due diligence" in an effort to more definitively determine "the source and chain of custody" of their conflict minerals. *Id.* While the SEC did not expressly spell out the steps that must be taken to qualify as "due diligence," the Final Rule does require an issuer "to use a nationally or internationally recognized due diligence framework, if such a framework is available for the specific conflict mineral." *Id.* at 56,326. Specifically, the Commission confirmed that the OECD due diligence guidance "satisfies [its] criteria and may be used as a framework for purposes of satisfying the final rule's requirement that an issuer exercise due diligence in determining the source and chain of custody of its conflict minerals." *Id.* (citing OECD Due Diligence Guidance). Further, the Adopting Release confirms that a "critical component of due diligence" is an independent, private sector audit designed to ensure that the issuer's due diligence "is in conformity with . . . [a] nationally or internationally recognized due diligence framework," and that the issuer's actual due diligence efforts comport with the due diligence approach described in its report. *Id.* at 56,320, 56,329.[8] Depending on the information uncovered during the due diligence process, an issuer may then be required to prepare a Conflict Minerals Report. If, following due diligence, "an issuer determines that its conflict minerals *did not* originate in the Covered Countries or that its conflict minerals *did* come from recycled or scrap sources, then no Conflict Minerals Report is required." *Id.* at 56,312 (emphasis added). The issuer must still, however, prepare and submit a Form SD to the

---

[8]     The SEC did, however, authorize an exception to the mandatory audit component with respect to minerals believed to have come from a recycled or scrap source. *See* 77 Fed. Reg. at 56,322 n.561 ("[A]n issuer exercising due diligence to determine whether a conflict mineral is from a recycled or scrap source is not required to obtain an independent private sector audit of its Conflict Minerals Report, regarding that conflict mineral, if there is no nationally or internationally recognized due diligence framework for that recycled or scrap conflict mineral.").

Commission describing the scope and results of its due diligence efforts.  *Id.*  By contrast, if the issuer's due diligence reveals that its minerals *did* originate in the Covered Countries and *did not* come from recycled or scrap sources—or if the issuer cannot determine the source of its conflict minerals through due diligence—then the issuer must prepare and submit a Conflict Minerals Report to the SEC.  *Id.* at 56,313.

The Conflict Minerals Report must include, among other matters, "a description of the measures the issuer has taken to exercise due diligence on the source and chain of custody of [its] conflict minerals," accompanied by "a certified independent private sector audit."  *Id.* at 56,320.  In addition, unless the issuer's products can be identified as "DRC conflict free," the report must set forth "a description of the facilities used to process those conflict minerals, the country of origin of those conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity."  *Id.*  An issuer's Conflict Minerals Report must also include a description of its products that have "not been found to be 'DRC conflict free,'" although issuers can include additional explanatory information they believe necessary or appropriate.  *Id.* at 56,322 ("[I]ssuers can add disclosure or clarification," which "allows issuers to include the statutory definition of 'DRC conflict free' in the disclosure to make clear that 'DRC conflict free' has a very specific meaning, or to otherwise address their particular situation.").  On this last point, the Commission also authorized a temporary transition period allowing companies unable to determine the origin of their conflict minerals to describe those minerals as "DRC conflict undeterminable," rather than as having "not been found to be 'DRC conflict free.'"  *Id.* at 56,321.  The Rule allows this alternative description for a two-year period

for all reporting issuers, and for a four-year period for "smaller" companies.  *Id.* at 56,321-56,322.[9]

Significantly, the Rule does not require that companies place any type of label or disclosure on products.  *Id.* at 56,323 ("We note that many commentators appeared to believe that the proposed rules would require that an issuer physically label its products as "DRC conflict free" or not "DRC conflict free" . . . . The final rule does not require a physical label on any product.").  Rather, these descriptions must be set forth in an issuer's Conflict Minerals Report, if at all, although a copy of the Conflict Minerals Report must also be publicly posted on the company's website, as well.  *See* 15 U.S.C. § 78m(p)(1)(E); 77 Fed. Reg. at 56,362-56,363.

The Final Rule became effective on November 13, 2012, and the first reports and disclosures it requires are due to be filed with the SEC by May 31, 2014.  77 Fed. Reg. at 56,274.

### b)  *Significant Comments and Issues Considered by the Commission*

Insofar as they are relevant to the claims Plaintiffs press in this case, the Court summarizes some of the more significant comments and issues considered—and in some cases, adopted—by the Commission during the rulemaking process.

First, many commentators urged the Commission to adopt a *de minimis* exception to the Rule's coverage, submitting a wide variety of proposed threshold amounts for the SEC's

---

[9]     The Commission explained its rationale for adopting this temporary period as follows:

> We are permitting this temporary category to address concerns of many industry commentators that supply chain due diligence mechanisms have not yet been established; and, therefore, many issuers will not be able to readily determine whether their conflict minerals did not originate in the Covered Countries, did not finance or benefit armed groups, or did come from recycled or scrap sources. This temporary category should allow issuers time to establish [appropriate] supply chain due diligence mechanisms.

77 Fed. Reg. at 56, 321.  The Commission additionally believed that "this approach will allow the final rule to more appropriately target the population of issuers from which Congress intended to require this disclosure and will allow time for processes to be put in place so that issuers may be able to determine the origin of their conflict minerals."  *Id.*

consideration.  *See* 77 Fed. Reg. at 56,295, 56,298.  For example, some commentators suggested

that an issuer should be exempt from coverage if the cost of conflict minerals in its products

makes up less than 1% of the issuer's total production costs.  *Id.* at 56,295.  Some other

stakeholders recommended a *de minimis* exception applicable to "trace, nominal, or insignificant

amounts of conflict minerals" that are part of a company's products.  *Id.*  And still other

commentators proposed the adoption of a *de minimis* exception in circumstances "when the

issuer is unable to determine the origin of only 5% of the product's minerals," "for products

containing less than 0.1% by weight of a conflict mineral," and/or "if an issuer's global usage of

conflict minerals comprised less than 0.01% of its materials."  *Id.*  Ultimately, the Commission

declined to adopt any categorical *de minimis* exception as part of the Final Rule.  *Id.* at 56,298.

In its view, a *de minimis* threshold would have been contrary to the Rule's purpose, given that

the standard "focuses on whether the conflict mineral is 'necessary' to a product's functionality

or production," rather than "the amount of a conflict mineral contained in the product."  *Id.*  The

SEC, in reaching this decision, also relied upon commentators' indications that conflict minerals

"are often used in products in very limited quantities," as well as the Commission's own

"understand[ing] that there are instances in which only a minute amount of conflict minerals is

necessary for the functionality or production of a product."  *Id.*

   In addition, the SEC received a number of comments encouraging the Commission not to

apply the Final Rule to companies that "contract to manufacture" products containing necessary

conflict minerals, but that do not "manufacture" such products directly.  *Id.* at 56,289-56,290.

Despite the urging of those commentators, the Commission ultimately determined that the Rule

should apply to both categories of issuers—those that directly manufacture products containing

necessary conflict minerals, as well as those that contract to manufacture such products.  *Id.* at

56,290.  In so doing, the Commission declined to define "contract to manufacture" in the Final

Rule, believing such a definition would prove "unworkable."  *Id.* at 56,290-56,291.  But the

Adopting Release does offer guidance.  The SEC explained that the term "contract to

manufacture" only "include[s] issuers that have some actual influence over the manufacture of

their products."  *Id.* at 56,291.  Consequently, the Commission explained that an issuer would not

be viewed as "contracting to manufacture a product" if "its actions involve no more than": (a)

"[s]pecifying or negotiating contractual terms . . . that do not directly relate to the manufacturing

of the product, such as training or technical support, price, insurance, indemnity, intellectual

property rights, dispute resolution, or other like terms . . ."; (b) "[a]ffixing its brand, marks, logo,

or label to a generic product manufactured by a third party"; or (c) "[s]ervicing, maintaining, or

repairing a product manufactured by a third party."  *Id.*  In the Commission's view, this approach

avoids sweeping "pure retailer[s]" into the Rule's scope, given that companies simply "offer[ing]

a generic product under [their] own brand name or a separate brand name" generally do not

"exert a sufficient degree of influence" over the manufacturing process.  *Id.* at 56,292.

As another key point, the proposed rule would have required an issuer to undertake full-

blown due diligence efforts if, based on its reasonable country of origin inquiry, it was "unable to

determine that its conflict minerals *did not* originate in the Covered Countries."  *Id.* at 56,312.

Believing this framework would unreasonably require issuers to "prove a negative," the

Commission ultimately concluded that such an "approach would arguably be more burdensome

than necessary to accomplish the [Rule's] purpose," and that "requiring a certainty in this setting

would not be reasonable and may impose undue costs."  *Id.* at 56,312-56,313.  As a result, the

Final Rule incorporates the standard outlined above, whereby an issuer is excused from due

diligence obligations so long as it "has no reason to believe that its conflict minerals may have

originated in the Covered Countries," or "reasonably believes that its conflict minerals are from recycled or scrap sources." *Id.* at 56,313.   In the SEC's view, this procedure struck the appropriate balance: "This revised approach does not require an issuer to prove a negative to avoid moving to [due diligence], but it also does not allow an issuer to ignore or be willfully blind to warning signs or other circumstances indicating that its conflict minerals may have originated in the Covered Countries." *Id.*

Separately, the terms of the proposed rule also would have required issuers unable to determine the source of their conflict minerals to describe their products in the Conflict Minerals Report as "not DRC conflict free." *Id.* at 56,317.  Responding to commentators' concerns that it "would impose an unfair stigma" on companies that are forced to describe products as "not DRC conflict free," "particularly on issuers that did not know whether their minerals directly or indirectly financed or benefited armed groups in the Covered Countries," the Commission modified the applicable language in the Final Rule.  *Id.* at 56,322.  Instead, issuers must now explain that such products have "not been found to be 'DRC conflict free'" (unless they rely upon the alternative disclaimer of "DRC conflict undeterminable" during the temporary transition period).  *Id.*  In the Commission's view, this approach avoids incentivizing issuers to "avoid determining the origins of the conflict minerals that they use," while remaining faithful to "Congress's directive in Section 1502" of Dodd-Frank. *Id.* at 56,321.[10]

---

[10]     Again, given the breadth and complexity of the issues addressed in the SEC's Adopting Release, this section summarizes only a small segment of the issues considered during the rulemaking—those most germane to the claims before the Court.  Curious readers should consult the full Adopting Release in the Federal Register for a more comprehensive review.

### B.  Procedural History

Plaintiffs initially filed this action with the U.S. Court of Appeals for the D.C. Circuit, invoking 15 U.S.C. § 78y as the direct jurisdictional springboard to the Court of Appeals.  While the case was pending with the appellate court, however, the D.C. Circuit issued its decision in *American Petroleum Institute v. SEC*, 714 F.3d 1329 (D.C. Cir. 2013), concluding that it lacked jurisdiction over a direct challenge to a different SEC rule issued under Dodd-Frank. *Id.* at 1333. The D.C. Circuit held that its original jurisdiction under Section 25 of the Exchange Act is limited to challenges to "final orders issued by the Commission" and to challenges to "rules promulgated pursuant to enumerated sections of the Act." *Id.*  Outside of those limited circumstances, the Circuit explained, "a party must first proceed by filing suit in district court" under the APA. *Id.*  The *American Petroleum* decision was issued on April 26, 2013; four days later—apparently reading the writing on the wall—Plaintiffs (then Petitioners) moved to transfer the instant case to the U.S. District Court for the District of Columbia under 28 U.S.C. § 1631, and the Circuit granted that request.

Following transfer of this matter to the undersigned on May 2, 2013, the Court directed the parties to submit a status report outlining how they wished to proceed—and, in particular, indicating whether any party desired to submit new or additional briefing, or whether the parties preferred the Court to simply treat the briefs previously filed with the Court of Appeals as cross-motions for summary judgment. (*See* Dkt. No. 2).  The parties opted for the latter approach, agreeing that there was no need for additional briefing; the parties requested that the Court treat Plaintiffs' (formerly Petitioners') brief filed with the D.C. Circuit as a motion for summary judgment, and the Commission's and Intervenors' appellate briefs as cross-motions for summary judgment. (*See* Dkt. No. 9).  The parties also requested expedited review of this case. (*Id.*).  The Court adopted this approach via Order on May 16, 2013, and set a hearing on the cross-motions

for July 1, 2013.  The Court entertained argument from the parties for nearly three hours on the 1st of July, and took this matter under submission at that time.[11]

## ANALYSIS

This case presents two separate categories of claims for the Court's review.  First, Plaintiffs challenge the SEC's promulgation of the Conflict Minerals Rule under the APA, claiming that the Commission ignored its statutory obligations under the Exchange Act in issuing the Rule and that the Commission's rulemaking was arbitrary and capricious in several other respects.  Second, Plaintiffs mount a constitutional attack against both the Final Rule and Section 1502 of Dodd-Frank, contending that the obligation for companies to publish their conflict minerals disclosures on their own websites compels speech in violation of the First Amendment.  The Court discusses these two subjects separately below.

---

[11]      While the case was pending with the D.C. Circuit, several *amici* submitted briefs, some supporting the Plaintiffs/Petitioners, and others supporting the Commission.  Upon transfer, this Court ruled that all *amici* that had filed briefs in the Court of Appeals under D.C. Circuit Rule 29(a) would be permitted to participate as *amici* in these proceedings.  Accordingly, along with the parties' respective briefs, the Court also received *amicus* briefs from the following: (1) Professor Marcia Narine, Ambassador Jendayi Frazer, and Dr. J. Peter Pham (in support of Plaintiffs); (2) the "Industry Coalition"—American Coatings Association, Inc., American Chemistry Council, Car Manufacturers Institute, Consumer Specialty Products Association, National Retail Federation, Precision Machinated Products Association, and The Society of the Plastics Industry, Inc. (in support of Plaintiffs); (3) Better Markets, Inc. (in support of the SEC); (4) Global Witness Limited, Fred Robards, and Gregory Mthembu-Salter (in support of the SEC); and (5) a group of Congressional *amici*—Sen. Barbara Boxer, Sen. Dick Durbin, former Sen. Russ Feingold, former Rep. Howard Berman, Rep. Wm. Lacy Clay, Rep. Keith Ellison, Rep. Raul Grijalva, Rep. John Lewis, then-Rep. (now Sen.) Ed Markey, Rep. Jim McDermott, Rep. Gwen Moore, and Rep. Maxine Waters (in support of the SEC).  Copies of these briefs can be found in the case file transferred from the Court of Appeals, contained in the various attachments at Docket Entry No. 1 on the Court's electronic docket.

### A. Plaintiffs' APA Claims

#### 1. <u>Applicable Standards of Review</u>

"When ruling on a summary judgment motion in a case involving final review of an agency action under the APA, the standards of Federal Rule of Civil Procedure 56(c) do not apply because of the limited role of the court in reviewing the administrative record." *Int'l Swaps & Derivatives Ass'n v. U.S. Commodity Futures Trading Comm'n*, 887 F. Supp. 2d 259, 265-66 (D.D.C. 2012). Instead, "[s]ummary judgment serves as a mechanism for deciding, as a matter of law, whether the administrative record supports the agency action and whether the agency action is consistent with the APA standard of review." *Id.* at 266 (citing *Richards v. INS*, 554 F.2d 1173, 1177 & n.28 (D.C. Cir. 1977)). Under the APA, agency action is unlawful if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The "arbitrary and capricious" standard of review is a narrow one, and it is well settled that "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While the reviewing court must conduct a "searching and careful" review, the agency's action remains "entitled to a presumption of regularity," *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971), and the court "will not second guess an agency decision or question whether the decision made was the best one," *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1565 (D.C. Cir. 1991). But the court must nevertheless be satisfied that the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43; *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1036 (D.C. Cir. 2012).

Moreover, where a case turns on the agency's interpretation of a statute it is charged with implementing, courts apply the well-worn, two-part *Chevron* test. *Chevron U.S.A. Inc. v.*

*Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984).  Under *Chevron* Step One, the court must first determine "whether Congress has directly spoken to the precise question at issue."  *Id.* at 842; *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 154 (D.C. Cir. 1990).  If so, then the court's inquiry ends, and the clear and unambiguous statutory language controls.  *See Northeast Hosp. v. Sebelius*, 657 F.3d 1, 4 (D.C. Cir. 2011) (citing *Chevron*, 467 U.S. at 842-43). In answering this question, the court reviews the statute *de novo*, "employing traditional tools of statutory construction," *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228 (D.C. Cir. 2007), by assessing "the statutory text at issue, the statute as a whole, and . . . legislative history where appropriate," *Int'l Swaps*, 887 F. Supp. 2d at 268 (internal citations omitted); *see also Bell Atl. Tel. Co. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (characterizing the *Chevron* Step One inquiry "as a search for the plain meaning of the statute").  If the statute is ambiguous, however, then the analysis shifts to *Chevron* Step Two, whereby the reviewing court must consider "whether the agency's [interpretation] is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843; *see also Peter Pan Bus Lines v. FMSCA*, 471 F.3d 1350, 1353 (D.C. Cir. 2006).  Under *Chevron*, "[a] statute is ambiguous if it can be read more than one way." *Am. Fed'n of Labor & Cong. of Indus. Org.v. Fed. Election Comm'n*, 333 F.3d 168, 173 (D.C. Cir. 2003).  "Because the judiciary functions as the final authority on issues of statutory construction, an agency is given no deference at all on the question whether a statute is ambiguous." *Wells Fargo Bank, N.A. v. Fed. Deposit Ins. Corp.*, 310 F.3d 202, 205-06, (D.C. Cir. 2002) (internal citations and quotation marks omitted).

### 2.  <u>The SEC's Statutory Obligations Under The Exchange Act</u>

Plaintiffs' briefing opens with an overarching challenge to the Commission's promulgation of the Conflict Minerals Rule: they argue that the SEC failed to "analyze properly

the costs and benefits" of the Rule as a whole, ostensibly in contravention of its statutory directives under the Exchange Act. (Pls.' Brief at 26-27). From Plaintiffs' view, "[t]he Commission had to conduct an adequate analysis of the overall costs and benefits of the rule, including the alternatives it adopted, in order to satisfy its statutory obligations and exercise its authority in a reasoned manner." (*Id.* at 26). They claim that the Commission shirked its statutory obligations to consider "whether the action will promote efficiency, competition, and capital formation," 15 U.S.C. § 78c(f), and to ensure that the Rule would not "impose a burden on competition not necessary or appropriate in furtherance of the purposes of" the Exchange Act, *id.* § 78w(a)(2). Plaintiffs argue that the SEC was required by the Exchange Act to independently determine whether the rule was "necessary or appropriate . . . to decrease the conflict and violence in the DRC." (Pls.' Reply at 4). As Plaintiffs see it, the Commission abdicated this responsibility and improperly deferred to "Congress's determination that conflict minerals disclosure will yield social benefits in the form of decreasing conflict and violence in the DRC," (*id.* at 3), and "failed to even conclude that [its] choices will improve conditions in the DRC at all," (Pls.' Brief at 33). By supposedly ducking this statutory obligation, Plaintiffs contend, the Commission's decision-making was arbitrary and capricious, necessitating vacatur of the Conflict Minerals Rule. The Court disagrees.[12]

To begin with, Sections 3(f) and 23(a)(2) of the Exchange Act simply do not mandate the type of analysis Plaintiffs claim was lacking here. Section 3(f) provides that whenever "the Commission is engaged in rulemaking . . . and is required to consider or determine whether an action is necessary or appropriate in the public interest, the Commission shall also *consider*, in

---

[12]     The Court finds it somewhat telling that Plaintiffs devoted almost no attention to this particular theory during oral argument—never so much as invoking 15 U.S.C. §§ 78c(f) or 78w(a)(2) during their presentation. Instead, Plaintiffs focused on the specific challenges to particularized aspects of the Final Rule, which the Court tackles in the sections that follow.

addition to the protection of investors, *whether the action will promote efficiency, competition, and capital formation*." 15 U.S.C. § 78c(f) (emphasis added). And Section 23(a)(2) states that the Commission shall, "in making rules and regulations . . . [,] *consider* among other matters the impact any such rule or regulation would have *on competition*," and "shall not adopt any such rule or regulation which would impose *a burden on competition* not necessary or appropriate in furtherance of the purposes" of the Act. *Id.* § 78w(a)(2) (emphasis added). By their terms, these provisions only obligate the SEC to "consider" the impact that a rule or regulation may have on various *economic-related factors*—efficiency, competition, and capital formation. In doing so, the Commission may deem it appropriate (or even necessary) to weigh the costs and benefits of its proposed action as related to these enumerated factors, but to suggest that the Exchange Act mandates that the SEC conduct some sort of broader, wide-ranging benefit analysis simply reads too much into this statutory language. This is particularly true here, where the resulting benefits Plaintiffs accuse the Commission of ignoring relate to *humanitarian* objectives that Congress concluded would be achieved by the rulemaking, rather than some sort of *economic* objectives underlying the Commission's rule. (*See, e.g.*, Pls.' Brief at 1 (complaining that the SEC "did not determine whether the rule will provide *any* benefits to the people of the DRC") (emphasis in original); *id.* at 23 ("[T]he Commission imposed these enormous costs without determining whether the rule would yield *any* benefits for the Congolese people.") (emphasis in original); Pls.' Reply at 1-2 ("[T]he Commission failed to assess whether these determinations would yield *any* benefits or instead make a tragic humanitarian situation even worse.") (emphasis in original)). Simply put, there is no statutory support for Plaintiffs' argument that the Commission

was required to evaluate whether the Conflict Minerals Rule would actually achieve the social benefits Congress envisioned.[13]

Nor is Plaintiffs' argument reinforced by any of the Circuit precedent they cite.  It is true, as Plaintiffs assert, that our Court of Appeals has emphasized the SEC's "statutory obligation to determine as best it can the economic implications of its rule."  *Bus. Roundtable v. SEC*, 647 F.3d 1144, 1148 (D.C. Cir. 2011) (emphasizing the Commission's "unique obligation to consider the effect of a new rule upon 'efficiency, competition, and capital formation,'" under 15 U.S.C. §§ 78c(f) & 78w(a)(2)); *see also Am. Equity Inv. Life Ins. Co. v. SEC*, 613 F.3d 166, 176-77 (D.C. Cir. 2010) (applying Securities Act's companion provision, 15 U.S.C. § 77b(b), which similarly requires the SEC to consider "efficiency, competition, and capital formation"); *Chamber of Commerce v. SEC*, 412 F.3d 133, 143 (D.C. Cir. 2005) (construing companion provision of the Investment Company Act, 15 U.S.C. § 80a-2(c), which tracks the same language).  In this vein, the D.C. Circuit has: invalidated a rule based on the Commission's failure "to estimate and quantify the costs it expected companies to incur," and its "ducking serious evaluation of the costs that could be imposed upon companies," *Bus. Roundtable*, 647 F.3d at 1150, 1152; vacated a rule due to the SEC's failure to conduct "an analysis of whether the *specific rule* will promote efficiency, competition, and capital formation," *Am. Equity*, 613 F.3d at 178 (emphasis in original); and struck down a regulation because the SEC failed to determine a "range within which a fund's cost of compliance will fall," which the court found

_____

[13]    For this same reason, Plaintiffs' reliance on *Public Citizen v. Federal Motor Carrier Safety Administration*, 374 F.3d 1209 (D.C. Cir. 2004), is equally misplaced.  In *Public Citizen*, the Circuit invalidated an FMCSA rule concerning commercial motor vehicles because the FMCSA clearly failed to consider an issue during the rulemaking—driver health and safety— that it was expressly required to consider by statute.  *Id.* at 1216-17.  Setting aside the fact that the portions of *Public Citizen* cited by Plaintiffs are plainly dicta, that decision is inapposite because, unlike the FMCSA in *Public Citizen*, the Commission had no statutory obligation to evaluate the humanitarian impact and social benefits of the Conflict Minerals Rule.

"would be pertinent to its assessment of the effect the condition would have upon efficiency and competition, if not capital formation," *Chamber of Commerce*, 412 F.3d at 143-44.  As should be clear, however, all of those cases involved shortcomings on the Commission's part with respect to the *economic* implications of its actions—economic implications that the SEC was statutorily required to consider in adopting the challenged rules.  By contrast, none of those decisions lends support to Plaintiffs' theory that the Conflict Minerals Rule must be invalidated because the SEC failed to consider whether the Rule would actually achieve the *humanitarian* benefits identified by Congress.[14]

Plaintiffs also fail to account for another important distinction between those decisions and the case at bar.  All of those cases involved rules or regulations that were proposed and adopted by the SEC of its own accord, with the Commission having independently perceived a problem within its purview and having exercised its own judgment to craft a rule or regulation aimed at that problem.  *See Bus. Roundtable*, 647 F.3d at 1146 (reviewing proxy rule adopted by the SEC based on its belief that "the current process impede[d] the expression of shareholders' right under state corporation laws to nominate and elect directors"); *Am. Equity*, 613 F.3d at 170-

---

[14]     The Commission appropriately recognized this distinction in its Adopting Release, explaining that:

> Congress intended for the rule issued pursuant to Section 1502 to decrease the conflict and violence in the DRC, particularly sexual and gender based violence.  A related goal of the statute is the promotion of peace and security in the Congo.  These are compelling social benefits, which we are unable to readily quantify with any precision, both because we do not have the data to quantify the benefits and because we are not able to assess how effective Section 1502 will be in achieving those benefits.  *We also note that these objectives of Section 1502 appear to be directed at achieving overall social benefits and are not necessarily intended to generate measurable, direct economic benefits to investors or issuers specifically. Additionally, the social benefits are quite different from the economic or investor protection benefits that our rules ordinarily strive to achieve.*

77 Fed. Reg. at 56,350 (emphasis added); *see also id.* ("[U]nlike in most of the securities laws, Congress intended the Conflicts Mineral Provision to serve a humanitarian purpose, which is to prevent armed groups from benefiting from the trade of conflict minerals.").

71 (invalidating "Rule 151A," through which the SEC "sought to ensure that purchasers of [fixed index annuities] would be entitled to the full protection of the federal securities laws"); *Chamber of Commerce*, 412 F.3d at 137 (reviewing rule amending mutual fund regulations based on the SEC's belief that "more was required" due to a "serious breakdown in management controls"). Here, by contrast, the Commission promulgated the Conflict Minerals Rule pursuant to an express, statutory directive *from Congress*, which was driven by *Congress's determination* that the due diligence and disclosure requirements it enacted would help to promote peace and security in the DRC.  As a result, the SEC rightly maintains that its role was not to "second-guess" Congress's judgment as to the benefits of disclosure, but to, instead, promulgate a rule that would promote the benefits Congress identified and that would hew closely to that congressional command.  *See Pub. Citizen v. FTC*, 869 F.2d 1541, 1557 (D.C. Cir. 1989) ("[A]gencies surely do not have inherent authority to second-guess Congress' calculations."); *Kimberlin v. U.S. Dep't of Justice*, 150 F. Supp. 2d 36, 48 (D.D.C. 2001) (same).

Therefore, while Plaintiffs inveigh against the Commission's apparent disregard for its "statutory mandate" in failing to assess whether the Conflict Minerals Rule would actually achieve the benefits Congress identified, this argument rests on a false premise.  The Exchange Act imposes no such statutory obligation.  And framed appropriately, the Court is easily convinced that the Commission discharged any potential responsibility to consider whether the Final Rule will "promote efficiency, competition, and capital formation," and that the Commission appropriately considered the Rule's impact on competition more generally, as

required by the Exchange Act.  *See* 15 U.S.C. §§ 78c(f), 78w(a)(2).[15]  Indeed, Plaintiffs do not

meaningfully contest these points.

First, the Adopting Release confirms that the Commission considered the Rule's impact

on efficiency, explaining "that the required disclosure will help investors in pricing the securities

of the issuers subject to the Conflict Minerals Statutory Provision" and "could improve

informational efficiency."  77 Fed. Reg. at 56,350.  On the other hand, the SEC posited that

because "the cost of compliance for this provision will be borne by the shareholders of the

company," the Rule could "divest capital away from other productive opportunities" and "may

---

[15]     In the Court's view, it is not clear that the requirements of Section 3(f) even apply to this rulemaking in the first place.  By its terms, this provision is only triggered when the Commission "is required to consider or determine whether an action is necessary or appropriate in the public interest."  15 U.S.C. § 78c(f).  Here, the Commission was not required to make such a consideration or determination; in a sense, Congress had already done so, concluding that the conflict minerals disclosure scheme was "necessary" and/or "appropriate in the public interest." *See* Dodd-Frank § 1502(a), 124 Stat. 2213 (explaining Congress's belief that the "emergency humanitarian situation" in the Democratic Republic of the Congo "warrant[ed] the provisions of section 13(p) of the Securities Exchange Act").  Absent such a requirement on the Commission's part, it seems that Section 3(f)'s directive to consider the Rule's effect on "efficiency, competition, and capital formation" would not have even been triggered.  Moreover, as reflected in other provisions of the Exchange Act, when Congress expects the SEC to undertake this type of analysis, it expressly uses the phrase "as necessary or appropriate in the public interest" in the relevant statute.  *See, e.g.*, 15 U.S.C. § 78f(a) (authorizing the Commission to issue rules and regulations related to an entity's registration with the SEC "as necessary or appropriate in the public interest"); *id.* § 78*l*(b)(1) (empowering the SEC to promulgate rules surrounding the information required to register securities with the Commission, "as necessary or appropriate in the public interest"); *id.* § 78m(q)(2)(D)(ii)(VII) (authorizing the Commission to promulgate rules "necessary or appropriate in the public interest" related to a disclosure regime concerning "resource extraction issuers").  Congress did not use such language here.

Nevertheless, insofar as the Commission considered itself subject to the requirements of Section 3(f), along with those under Section 23(a)(2), (*see* Def.'s Brief at 29), the Court need not conclusively decide this issue.  Since the SEC conducted an analysis under Section 3(f) in adopting the Final Rule without any suggestion that such an analysis was not required, the Court evaluates the propriety of the Commission's analysis as performed, including its compliance with 15 U.S.C. § 78c(f).  *Am. Equity*, 613 F.3d at 177 ("[T]he SEC must defend its analysis before the court upon the basis it employed in adopting that analysis.").  However, this should not be taken as a ruling that such an analysis was actually required in connection with this particular rulemaking.

result in a loss of allocative efficiency," although such loss might be offset "by increased demand for the firm's products and/or shares by socially conscious consumers and investors." *Id.* Second, the Commission considered whether the Rule would "have a significant impact on capital formation," explaining that it "[did] not expect that the rule would negatively impact prospects of the affected industries to the extent that would result in withdrawal of capital from these industries." *Id.* at 56,350-56,351. And third, the Commission considered the Rule's effect on competition, noting that "issuers with a reporting obligation under the Conflict Minerals Statutory Provision could be put at a competitive disadvantage with respect to private companies that do not have such an obligation." *Id.* at 56,350. The SEC also observed that "the implementation of the statute may provide significant advantage to foreign companies that are not reporting in the United States . . . but do compete directly with reporting issuers in the United States." *Id.* But on balance, the SEC concluded that "to the extent the final rule implementing the statute imposes a burden on competition in the industries of affected issuers," it "believe[d] the burden is necessary and appropriate in furtherance of the purposes of Section 13(p)." *Id.*

Therefore, upon review of the record, the Court is convinced that the Commission appropriately considered the various factors that Sections 3(f) and 23(a)(2) of the Exchange Act actually require. No statutory directive obligated the Commission to reevaluate and independently confirm that the Final Rule would actually achieve the humanitarian benefits Congress intended. Rather, the SEC appropriately deferred to Congress's determination on this point, and its conclusion was not arbitrary, capricious, or contrary to law—whether because of some statutory directive under the Exchange Act or otherwise.

### 3.   The Commission's Estimation of Particular Costs

Plaintiffs next argue—albeit somewhat weakly—that the Commission arbitrarily underestimated some aspects of the Rule's costs.  Parroting language from our Circuit, Plaintiffs accuse the Commission of "inconsistently and opportunistically fram[ing] the costs" of the Rule and "fail[ing] adequately to quantify the certain costs."   (Pls.' Brief at 31) (quoting *Bus. Roundtable*, 647 F.3d at 1148-49).  In particular, Plaintiffs focus on two aspects of the Commission's cost analysis: information technology ("IT") costs and the estimated number of suppliers that will be impacted by the Rule.  As Plaintiffs see it, the Commission arbitrarily rejected the estimates that NAM submitted during the rulemaking process "simply because other commenters provided lower estimates."  (Pls.' Reply at 8).  These arguments miss the mark.

As a general matter, the Court disagrees that the Commission simply rejected NAM's estimates out of hand, as Plaintiffs assert.  Upon receiving four separate cost estimates from commentators (including one from NAM), the Commission noted the "wide divergence" among the various analyses, ranging from $387 million to $16 billion.  77 Fed. Reg. at 56,351.  As set forth in the Adopting Release, the Commission believed that "a combination of the analyses [would] provide a useful framework for understanding various cost components," and it "strive[d] to achieve a balanced and reasonable analysis based on the data and assumptions provided by all commentators, as well as [the Commission's] own analysis and assumptions." *Id.*  Moreover, while the Commission placed particular emphasis on two studies—those prepared by NAM and by Tulane University—it noted that "even these two studies did not provide sufficiently documented evidence to support all of their assumptions and assertions."  *Id.*  As a consequence, the SEC took "into account the views expressed in other comment letters, and made modifications to the analyses provided by the manufacturing industry association and university group commentators accordingly."  *Id.*  This approach, the Commission concluded,

"better synthesize[d] the information provided to [it] in the comment process." *Id.* This methodology strikes the Court as eminently appropriate, which means that Plaintiffs are left to argue that certain, specific aspects of the Commission's calculations were arbitrary and unreasonable. They fare no better on that front.

First, with respect to the IT costs, the Commission noted that "an important consideration" in these estimates was the "cost of upgrading or implementing changes to IT systems." *Id.* While the Commission initially looked to the IT cost estimates submitted by NAM and by Tulane University, it believed that those figures "may have been over-inclusive," given the input of other commentators who pointed out that: (1) "conflict minerals software for small companies can be downloaded for free"; (2) the systems used in NAM's and Tulane's studies were "the most expensive systems on the market"; and (3) many companies interviewed "would not need to invest in new software solely for conflict minerals." *Id.* But neither did the Commission accept, hook-line-and-sinker, the lower estimates submitted by those other commentators. Instead, the SEC struck what it believed to be the right balance among all the estimates submitted: "[W]e do not intend to replace the manufacturing industry association and university group commentators' cost estimates with the smaller estimate provided; rather, for purposes of our cost estimate, the appropriate estimate lies somewhere in between those two estimates." *Id.* While Plaintiffs may believe the Commission got it wrong, their disagreement does not render the SEC's analysis on this point arbitrary or unreasonable.

Nor was the Commission's analysis of the total number of affected first-tier suppliers improper. While NAM's study estimated that each issuer had an average of 2,000 first-tier suppliers, the Commission found that number "not supported by other estimates" and "difficult to reconcile with figures reported by other commentators." *Id.* at 56,352. At the same time, the

SEC also declined to accept the lower figure proffered by another commentator: "[We] do think a prudent reduction in the manufacturing industry association commentator's estimate is warranted, but here again, we do not know that 163 is any more representative of an average company's experience." *Id.* In turn, the Commission relied upon Tulane University's estimate of 1,060 average suppliers, which it found most reasonable. *Id.* In so doing, the Commission weighed comments received from the various parties and exercised its discretion in concluding which figures were most appropriate. While Plaintiffs, again, may disagree, the Court cannot say that the SEC acted arbitrarily or capriciously in reaching this particular estimate.

### 4.  The *De Minimis* Threshold

Plaintiffs next complain that the Commission wrongly failed to implement any type of a *de minimis* exemption from the Conflict Minerals Rule's coverage. Their attack on this front is twofold. They first contend that the Commission believed the statute unambiguously foreclosed any *de minimis* threshold, when, according to Plaintiffs, Congress actually left that determination up to the SEC. Because the Commission wrongly treated the statute as unambiguous and thought itself precluded from even considering a *de minimis* exception, Plaintiffs argue, the Court should not afford the SEC's determination any deference and should instead remand to the agency for further proceedings. Second, Plaintiffs insist that even if the Commission did exercise its discretion on this point, its analysis of the *de minimis* issue was arbitrary and cannot survive APA review. In particular, Plaintiffs take issue with the Commission's allegedly conclusory rationale, and they fault the Commission for failing to conduct any meaningful analysis of the various *de minimis* proposals submitted during the rulemaking process. The Court considers each of these arguments in turn.

Beginning with Plaintiffs' opening theory, they maintain that Dodd-Frank § 1502 is silent, or at least ambiguous, as to the propriety of the SEC adopting a *de minimis* threshold as part of the Final Rule.   In support, Plaintiffs argue that the statute "does not forbid" or unambiguously foreclose the use of a *de minimis* exception, which, in their view, is an indication that "[t]he Commission plainly had power to adopt a *de minimis* exception."  (Pls.' Reply at 11). According to Plaintiffs, the SEC therefore could have looked to its general exemptive authority under the Exchange Act, through which the Commission can "exempt . . . any class or classes of persons, securities, or transactions, from any provision or provisions of [the Exchange Act] or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors."  15 U.S.C. § 78mm(a)(1); *see also id.* § 78*l*(h) (authorizing exemptions from several provisions of the Act, including Section 13, "upon such terms and conditions and for such period as it deems necessary or appropriate," provided "that such action is not inconsistent with the public interest or the protection of investors").   Alternatively, Plaintiffs contend that the Commission could have relied on its inherent authority, under general principles of administrative law, to create a *de minimis* exception.  *See, e.g.*, *Ala. Power Co. v. Costle*, 636 F.2d 323, 360-61 (D.C. Cir. 1979); *Ass'n of Admin. Law Judges v. FLRA*, 397 F.3d 957, 962 (D.C. Cir. 2005) ("As long as the Congress has not been 'extraordinarily rigid' in drafting the statute . . . 'there is likely a basis for an implication of *de minimis* authority to provide [an] exemption when the burdens of regulation yield a gain of trivial or no value.'") (quoting *Envt'l Def. Fund, Inc. v. EPA*, 82 F.3d 451, 466 (D.C. Cir. 1996)) (alterations in original).

Plaintiffs argue the Commission wrongly ignored these precepts and "concluded that it lacked authority" and was "precluded from considering" any *de minimis* exception as part of the

Final Rule.  (Pls.' Brief at 35).  To this end, Plaintiffs point to several statements by the SEC

within the Adopting Release:

- "The statute itself does not contain a *de minimis* exception, and for several reasons we believe it would be contrary to the Conflict Minerals Statutory Provision and Congressional purpose to include one," 77 Fed. Reg. at 56,298;

- "If [Congress] had intended that the provision be limited further, so as not to apply to a *de minimis* use of conflict minerals, we think Congress would have done so explicitly," *id.*; and

- "[W]e are of the view that Congress intended not to provide for a *de minimis* exception, and including one in the final rule would therefore thwart, rather than advance, the provision's purpose," *id.*

In this same vein, Plaintiffs also highlight several passages from the SEC's briefing in this case:

- "[T]he Commission's broader conclusion that consistent with the views of the State Department, we believe Congress intended the disclosure provisions to apply to the use of even smaller amounts of conflict minerals originating in the Covered Countries necessarily precluded the adoption of any of the *de minimis* thresholds," (Pls.' Reply at 11) (quoting Def.'s Brief at 48) (internal citations and quotation marks omitted);

- "It was not for the Commission, through *de minimis* exemptive authority, to find that Congress overreached and to bring the statutory requirements back into line," (*Id.*) (quoting Def.'s Brief at 46); and

- Highlighting the SEC's decision not "to create a *de minimis* exception based on its analysis of the 'text, structure, and purposes of Section 1502,'" (*Id.*) (citing and quoting Def.'s Brief at 16, 43).

Plaintiffs insist that these statements betray the SEC's unambiguous treatment of the statute

during the rulemaking process.

For its part, the Commission recognizes its general powers of exemptive authority—both

expressly under the Exchange Act and impliedly under general APA principles.  But the

Commission disagrees that it believed Congress, through Section 1502, unambiguously

foreclosed the use of those powers in the Conflict Minerals Rule.  According to the SEC, it "did

not conclude that it 'lacked authority' to create or that it 'was precluded from considering' a *de*

*minimis* exception." (Def.'s Brief at 44). Instead, the Commission rejoins that it exercised discretion in interpreting the statute, "appropriate[ly] examined whether such an exception would further the disclosure scheme Congress envisioned," and reasonably concluded that there was "ample reason to decline to create such an exception under either its general or its inherent authority." (*Id.* at 46). Since neither side contends that Congress clearly and unambiguously answered the question of whether a *de minimis* exception could be adopted as part of the Conflict Minerals Rule, the Court need not embark on a full-blown analysis under *Chevron* Step One. Rather, as do the parties, the Court treats the statute as silent on the *de minimis* issue. Ordinarily, the Court would therefore proceed to *Chevron* Step Two and determine whether the Commission's interpretation is "a permissible construction of the statute." *Chevron*, 467 U.S. at 863. But Plaintiffs insist that the Court's analysis must stop here.

On this point, Plaintiffs are correct that "deference to an agency's interpretation of a statute is not appropriate when the agency wrongly 'believes that interpretation is compelled by Congress.'" *Peter Pan*, 471 F.3d at 1354 (quoting *PDK Labs., Inc. v. U.S. Drug Enforcement Admin.*, 362 F.3d 786, 798 (D.C. Cir. 2004)). Rather, "*Chevron* step 2 deference is reserved for those instances when an agency recognizes that the Congress's intent is not plain from the statute's face." *Id.*; *see also Sec'y of Labor v. Nat'l Cement Co. of Cal.*, 494 F.3d 1066, 1073 (D.C. Cir. 2007) (applying these principles where the agency "incorrectly treated the statute as unambiguous and interpreted it accordingly"); *State of Ariz. v. Thompson*, 281 F.3d 248, 253-54 (D.C. Cir. 2002) (no *Chevron* deference accorded where agency "believe[d] that the statute clearly bar[red]" a contrary interpretation, and that it was "without discretion to reach another result"). Plaintiffs also rightly observe that, in such circumstances, the appropriate course of action is for a court to remand to the agency "to interpret the statutory language anew." *Peter*

*Pan*, 471 F.3d at 1354; *see also Int'l Swaps*, 887 F. Supp. 2d at 280-81. In Plaintiffs' view, this is precisely what transpired here. The Commission disagrees. The question for the Court, therefore, becomes whether, as Plaintiffs see things, the SEC treated Section 1502 as unambiguous on the *de minimis* issue and felt "without discretion to reach another result," or whether, as the Commission contends, it exercised its discretion in finding a *de minimis* exception inappropriate. On balance, the SEC has the better of this argument.

Most significantly, the language used by the Commission is a far cry from the type of definitive, declarative agency statements that our Circuit has described as a conclusion that the agency treated a statute as unambiguous. Plaintiffs do not identify any clear statement—either in the Adopting Release or in the SEC's briefing before the Court—showing that the Commission believed its interpretation was "plainly" required by the statute. *Contra Peter Pan*, 471 F.3d at 1353 (relying on agency statement that "[t]his interpretation is *not consistent with the plain language of the statute*") (emphasis in original); *Nat'l Cement*, 494 F.3d at 1074 (pointing to agency declaration that "the definition of 'coal or other mine' *plainly* includes a road such as the one at issue") (emphasis in original). Nor do Plaintiffs point to any statement on the Commission's part evincing a belief that the statute "[did] not permit" a contrary interpretation. *Contra Peter Pan*, 471 F.3d at 1353 (relying on agency statement that a statute "*does not permit* FMCSA to withhold registration for failure to comply with ADA requirements") (emphasis in original); *State of Ariz.*, 281 F.3d at 253 (looking to agency remark that "the TANF legislation . . . *does not permit* it being designated as the . . . primary program") (emphasis in original); *Transitional Hosps. Corp. of La. v. Shalala*, 222 F.3d 1019, 1029 (D.C. Cir. 2000) (relying on agency's statement that "[w]e *do not believe that the statute permits us* to extend the exclusion for long-term care hospitals") (emphasis in original). At best, the language Plaintiffs highlight

demonstrates that the Commission considered, as one part of its decision-making process, what it believed Congress's intent to have been in enacting Section 1502.   True, the Commission deployed traditional tools of statutory construction in doing so, looking to Congressional intent and legislative history.   But it is entirely appropriate for an agency, in the course of construing a statute it is charged with implementing, to consider whether a particular interpretation is consistent with the statute's purpose.   *See Vill. of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 665-66 (D.C. Cir. 2011) (explaining that agency's parsing of statutory language to discern Congress's intent, along with its consideration of legislative history, "appropriately guide[d] [the] agency in interpreting an ambiguous statute"); *see also Northpoint Tech., Ltd. v. FCC*, 412 F.3d 145, 151 (D.C. Cir. 2005) ("A 'reasonable' explanation of how an agency's interpretation serves the statute's objectives is the stuff of which a 'permissible' construction is made.") (citing *Cont'l Air Lines v. Dep't of Transp.*, 843 F.2d 1444, 1452 (D.C. Cir. 1988)).   This is all the Commission did here.

While the Court is mindful that the Commission did not explicitly indicate its belief that Section 1502 was ambiguous on the *de minimis* issue, our Circuit has expressly rejected the notion that "an assertion of ambiguity is required" by an agency in order to merit deference under *Chevron* Step Two.   *See Braintree Elec. Light Dep't v. FERC*, 667 F.3d 1284, 1288-89 (D.C. Cir. 2012) ("As long as the text is ambiguous and the agency does not insist that it is clear, a reasonable interpretation will warrant our deference.").

Further, Plaintiffs' argument overlooks the fact that the Commission's Adopting Release set forth additional policy-based and practical reasons underlying its belief that the adoption of a *de minimis* exception would be inappropriate.   Relying on commentators' feedback that conflict minerals "are often used in products in very limited quantities," the SEC determined that

"including a *de minimis* threshold could have a significant impact on the final rule."  77 Fed. Reg. at 56,298; *see also id.* ("[W]e understand that there are instances in which only a minute amount of conflict minerals is necessary for the functionality or production of a product.").  The Commission would have felt no need to discuss these reasons if it believed itself congressionally hamstrung from exercising its discretion on this issue.  It also bears noting that, in its Proposing Release, the Commission sought comment "as to whether there should be a *de minimis* threshold in [the] rules based on the amount of conflict minerals used by an issuer in a particular product or in its overall enterprise and, if so, whether such a threshold would be consistent with the Conflict Minerals Statutory Provision."  77 Fed. Reg. at 56,293.  If the Commission truly thought itself foreclosed from even considering a *de minimis* threshold, then there would have been no reason to solicit feedback on the issue as part of the rulemaking process.  Taking all of these factors into account, the Court concludes that the Commission did not believe its "interpretation [was] compelled by Congress," *Peter Pan*, 471 F.3d at 1354, but that the Commission instead exercised its independent judgment in declining to adopt a *de minimis* exception.[16]

As such, the Court's focus turns to *Chevron* Step Two, asking whether the Commission's interpretation of Section 1502 on this issue was permissible.  The Court need not tarry here long.

---

[16]      Plaintiffs additionally point to the fact that the Commission failed to include any discussion of the *de minimis* issues in the section of the Adopting Release entitled "Benefits and Costs Resulting From Commission's Exercise of Discretion."   (*See* Pls.' Reply at 10) (referencing 77 Fed. Reg. at 56,342-56,350).  This argument is unavailing.  For one thing, the Commission did not purport to summarize *all* of its discretionary decisions in that section, making clear instead that the SEC was focused on what it believed to be "*the most significant choices* [it] made in implementing the statute and the associated costs and benefits."  77 Fed. Reg. at 56,342 (emphasis added).  Perhaps in the SEC's mind, the *de minimis* issue did not qualify as a "significant choice[]," particularly given that the Commission's discussion of the *de minimis* threshold earlier in the Adopting Release hardly encompasses more than one page collectively.  The Court declines to attribute the significance to this omission that Plaintiffs invite.  But more to the point, whatever potential impact this single factor might merit, it does not outweigh the more consequential evidence in the record that the Court has already discussed.

Of course, the Court "defer[s] to the administering agency's interpretation as long as it reflects a permissible construction of the statute." *Friends of Blackwater v. Salazar*, 691 F.3d 428, 432 (D.C. Cir. 2012) (quoting *Sherley v. Sebelius*, 644 F.3d 388, 393 (D.C. Cir. 2011)).  And the Court has no trouble concluding that the SEC's interpretation—that it possessed discretion to determine whether a *de minimis* exception was appropriate—was permissible.  Indeed, this is the very interpretation Plaintiffs themselves champion.  (*See* Pls.' Reply at 11) ("The Commission plainly had power to adopt a *de minimis* exception.").  As a result, the Commission's reading of Section 1502, at least as it pertains to the *de minimis* exception, survives the *Chevron* gauntlet.

But this is still not the end of the matter, because not only do Plaintiffs challenge the Commission's interpretative approach, they also take issue with the SEC's application of its interpretation.  Stated another way, Plaintiffs argue that even if the Commission exercised discretion in not adopting a *de minimis* exception, its decision was still irrational and arbitrary.[17] In particular, Plaintiffs complain that the SEC relied too heavily on the State Department's assessment, and also that the Commission failed to analyze the various *de minimis* thresholds proposed by commentators during the rulemaking process.  On balance, while the Court agrees that the SEC's explanation arguably could have been more thorough in some respects, the Court cannot say that the Commission's determination was unreasonable or devoid of a "rational connection" in violation of the APA.

---

[17]    The Court is cognizant that sometimes "an arbitrary and capricious claim and a *Chevron* step two argument overlap," *see, e.g.*, *Gen. Instrument Corp. v. FCC*, 213 F.3d 724, 732 (D.C. Cir. 2000), but the Court views the two concepts as analytically distinct on this particular point, *see Cont'l Air Lines*, 843 F.2d at 1452 ("[I]nterpreting a statute is quite a different enterprise than policymaking.").  Plaintiffs do not claim that the statute was "unreasonably interpreted," *Gen. Instrument*, 213 F.3d at 732, rather they argue that the Commission's interpretation was unreasonably applied.

Based on the SEC's review of the information gathered during the rulemaking process, it concluded that adopting a *de minimis* exception would undermine the impact of the Final Rule. *See* 77 Fed. Reg. at 56,298 ("[W]e believe the purpose of the Conflict Minerals Statutory Provision would not be properly implemented if we included a *de minimis* exception."). In reaching this conclusion, the Commission weighed and evaluated feedback from commentators and stakeholders on both sides of the issue. Many commentators opposed the implementation of a *de minimis* exception, while others advocated in its favor and proposed a number of potential options. *See id.* at 56,295 & nn.213-223. Ultimately, the SEC thought that because conflict minerals "are often used in products in very limited quantities . . . [,] including a *de minimis* threshold could have a significant impact on the final rule." *Id.* at 56,298. As the Commission points out, this determination is supported by the record, including in comments proffered by the State Department, by the members of legislative branch, and by some industry stakeholders. *See id.* at 56,295 n.213; (*See, e.g.*, JA445 (U.S. Dep't of State Responses to Request for Comment) ("In light of the nature in which the covered minerals are often used in products, i.e. often in very limited quantities, such a change could have a significant impact on the proposed regulations. A de minimis threshold should not be considered under current circumstances."); JA103 (statement of Sen. Durbin and Rep. McDermott) ("[T]he weight of the conflict minerals so essential to many products is very small, and the percentage by weight or dollar value of the conflict minerals as a proportion of unit cost is often also very small."); JA602 (statement of Andrew Matheson, Boston Silicon Materials, LLC) (noting that although a "computer logic chip contains perhaps a few milligrams of tantalum," the "semiconductor industry as a whole consumes over 100 tons of tantalum metal annually," such that a proposal would "exempt (for example) all computer logic chips")). Moreover, the Commission also believed that the Rule's focus on

whether the minerals are "necessary to the functionality or production" of a particular product, along with the Rule's limited application to minerals that are "intentionally added," would mitigate some of the *de minimis* concerns identified by commentators. 77 Fed. Reg. at 56,298. In the Court's view, therefore, the Adopting Release—and the administrative record more broadly—establish that the SEC's *de minimis* determination was rationally based upon the evidence before it. While it may be true that the adoption of some type of *de minimis* approach could also have been a reasonable, alternative option, this does not render the SEC's contrary determination arbitrary or unreasonable.

The Court is similarly unpersuaded by Plaintiffs' argument that the Commission erred in failing to "analyze the many *de minimis* thresholds that commentators proposed." (Pls.' Brief at 37). While a regulation can be arbitrary and capricious if the agency "failed to address significant comments raised during the rulemaking," it is equally true that the "agency's obligation to respond . . . is not 'particularly demanding.'" *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 441-42 (D.C. Cir. 2012). Indeed, the D.C. Circuit has made clear that "[w]hile an agency must consider and explain its rejection of reasonably obvious alternatives, it need not consider every alternative proposed nor respond to every comment made." *Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). Rather, "[t]he failure to respond to comments is significant only insofar as it demonstrates that the agency's decision was not based on a consideration of the relevant factors." *Covad Commc'ns Co. v. FCC*, 450 F.3d 528, 550 (D.C. Cir. 2006). Applying these standards, the SEC was not required to exhaustively analyze each and every proposal it received during the rulemaking process. Instead, given its "broader conclusion" that conflict minerals are often used in minute amounts, the SEC believed that any type of categorical *de minimis* exception had the potential to

36

swallow the rule and would be inappropriate.   This analysis was sufficient to satisfy the Commission's obligations under the APA.

In sum, the Commission's choice not to include a *de minimis* exception in the Final Rule was the product of reasoned decision-making, and the Court finds no basis under the APA to subjugate the Commission's prerogative on this point.

### 5.   The Final Rule's Reasonable Country of Origin Inquiry

Plaintiffs next contest the propriety of the "reasonable country of origin inquiry" adopted as part of the Commission's Final Rule.   More specifically, Plaintiffs complain that "the SEC's extremely broad standard, requiring due diligence and reports not only when there is 'reason to believe' that the minerals 'did originate' in the region, but also whenever there is 'reason to believe' that the minerals '*may have* originated' in the region, is inconsistent with the statute." (Pls.' Reply at 20) (emphasis in original).[18]   On this claim, Plaintiffs first contend that the statute clearly compels their interpretation, which would limit the Rule's due diligence and reporting requirements to issuers with minerals that actually "did originate" in or around the DRC. Second, Plaintiffs argue that even if the statute were ambiguous, the SEC's interpretation merits no deference because it "wrongly believed its interpretation [was] compelled by Congress." (Pls.' Brief at 42).   Finally, while Plaintiffs dispute that the Commission exercised any discretion, they challenge its claimed exercise of judgment and its resultant interpretation of Section 1502 as arbitrary and capricious.

---

[18]    Originally, Plaintiffs also challenged what they believed to be the scope of the SEC's "reasonable country of origin inquiry," insofar as it would have required issuers to trace their minerals all the way back to a smelter.   (*See* Pls.' Brief at 43-46).   As the briefing progressed, however, and as the SEC further explained the Rule's application, Plaintiffs jettisoned this claim, (*see* Pls.' Reply at 20-21), and it was not raised during the hearing.   Consequently, the Court deems this argument abandoned and finds that it merits no further discussion.

As an initial matter, the Court disagrees that the statutory language clearly resolves this question.  True, the text of Section 1502 does require companies to disclose "whether" their necessary conflict minerals "did originate" in the Covered Countries.  *See* 15 U.S.C. § 78m(p)(1).  But this is far from an unambiguous Congressional directive, as Plaintiffs suggest.  Rather, as the Commission observes, the statute is silent as to *how* companies go about determining "whether" their minerals "did originate" in the Covered Countries in the first place.  Furthermore, the Commission rightly argues that "the statute is silent with respect to the disclosure obligations of issuers who, following [their] inquiry, do not know 'whether' those minerals 'did originate' in the Covered Countries."  (Def.'s Brief at 56).  The SEC, exercising its interpretive authority, sought to gap-fill this silence through the "reasonable country of origin inquiry" it created.  Contrary to Plaintiffs' arguments, this approach is not "inconsistent with the statutory text."  (Pls.' Reply at 20).[19]  Rather, the Court concludes that Congress did not directly speak to the precise circumstances triggering disclosure obligations (and, by implication, due diligence and reporting requirements) in enacting Section 1502.

The Court also rejects Plaintiffs' contention that *Chevron* deference is inappropriate because the SEC believed its interpretation was compelled by Congress.  To support their argument, Plaintiffs rely upon the SEC's statement in the Adopting Release that "requiring further steps by issuers that have reason to believe that they have necessary conflict minerals that

---

[19]     Relatedly, while Plaintiffs insist that Congress clearly limited the Rule's scope to minerals that "did originate" in the Covered Countries—choosing not to require reporting for minerals that "may have originated" in the Covered Countries—the legislative record suggests otherwise.  *See* 156 Cong. Rec. 3976 (May 19, 2010) (statement of Sen. Feingold) ("[The amendment] will require those companies to make public and disclose annually to the Securities and Exchange Commission *if the minerals in their products originated or may have originated* in Congo or a neighboring country.") (emphasis added).  While the Court would not—and does not—accord the floor statement of a single Senator dispositive weight one way or the other, the legislative history at least raises some question on this point.

may have originated in the Covered Countries is necessary to carry out the requirements contemplated by the statute." (Pls.' Brief at 41) (quoting 77 Fed. Reg. at 56,314). But again, this statement simply demonstrates that the Commission looked, at least in part, to the statute's purpose in crafting its own interpretation, which is entirely appropriate. *Vill. of Barrington*, 636 F.3d at 665-66; *Northpoint Tech.*, 412 F.3d at 151. This language does not, by contrast, indicate that the Commission felt its interpretation was "compelled by Congress," *Peter Pan*, 471 F.3d at 1354, or that it was "without discretion to reach another result," *State of Ariz.*, 281 F.3d at 253-54. To be sure, the Adopting Release is replete with remarks indicating precisely the opposite—that the Commission exercised its discretion in shaping this aspect of the Rule. *See* 77 Fed. Reg. at 56,313 ("*We believe* the [Final Rule's] approach . . . is most consistent with the statutory language and its purposes.") (emphasis added); *id.* at 56,314 ("This approach *strikes a more appropriate balance*.") (emphasis added); *id.* ("Alternatively, the Conflict Minerals Statutory Provision *could be interpreted* to require all issuers to determine whether their conflict minerals originated in the Covered Countries.") (emphasis added). Thus, having confirmed that the statute is ambiguous and that the SEC appropriately construed it as such, the Court proceeds to Plaintiffs' final argument—that the SEC falters at *Chevron* Step Two.

To repeat, the Court must defer to the Commission's interpretation "so long as it reflects a permissible construction of the statute," *Friends of Blackwater*, 691 F.3d at 432; *see also Menkes v. Dep't of Homeland Sec.*, 637 F.3d 319, 333 (D.C. Cir. 2011), and is "not otherwise arbitrary, capricious, or manifestly contrary to the statute," *Motion Picture Ass'n of Am. v. FCC*, 309 F.3d 796, 801 (D.C. Cir. 2002). The SEC's "reasonable country of origin inquiry" survives this deferential standard of review. Through the Final Rule, the Commission thought it appropriate to segregate issuers' obligations—both to trace their supply chains and to disclose

the results of those efforts to the SEC—into several steps, beginning with the "reasonable country of origin inquiry."  From there, under the Commission's interpretation of Section 1502, issuers who have no reason to believe that their minerals may have originated in the Covered Counties (or who reasonably believe their minerals came from recycled or scrap sources) need not conduct any further due diligence efforts, nor must they file a Conflict Minerals Report.  And even for issuers that must conduct due diligence under the Rule, only issuers that confirm their minerals originated in the Covered Countries, or that cannot ultimately determine the source of their minerals, must file a Conflict Minerals Report.  77 Fed. Reg. at 56,313.   In the Commission's view, this interpretation of Section 1502 struck the most "appropriate balance" in achieving the statute's objectives without imposing unnecessarily excessive costs on covered issuers.  *Id.* at 56,314.[20]

Notably, the Commission also recognized alternative interpretations it believed would have been permissible under the statute.  On the one hand, the Commission noted that Section 1502 could be interpreted to require due diligence efforts only from issuers that affirmatively determine that their minerals originated in the Covered Countries.  In the SEC's view, however, this interpretation had the potential to encourage willful blindness by issuers and could have created an incentive for issuers to avoid learning the true source of their minerals.  *Id.*  On the other side of the spectrum, the Commission observed that the statute could be interpreted to require *all* covered issuers to undertake due diligence efforts to determine the source of their minerals, regardless of whether issuers had any reason to believe that their minerals may have

---

[20]       Further, as noted earlier, the Commission's "reasonable country of origin approach" is modeled after and consistent with the "red flag" framework that triggers due diligence obligations under OECD guidance.  *See* 77 Fed. Reg. at 56,312.  The SEC's general adherence to "the only nationally or internationally recognized due diligence framework available," *id.* at 56,281, renders its interpretation all the more reasonable and permissible.

originated in the Covered Countries.  *Id.*  On balance, the Commission concluded that the most reasonable approach was to require due diligence efforts by issuers that know their conflict minerals originated, or that have "reason to believe" their minerals "may have originated," in the Covered Countries.  *Id.* at 56,312-56,314.  Again, while Section 1502 of Dodd-Frank requires companies to disclose "whether" their minerals "did originate" in the Covered Countries, the statute provides no further detail as to how companies reach this underlying determination in the first place.  According to the SEC, "the reasonable country of origin inquiry" offers a clear way for issuers to make this determination in a manner that "reduces the burdens" and is "cost-effective."  *Id.* at 56,314.  The Commission's approach to this issue surely constitutes a reasonable and permissible interpretation of Section 1502.

One final point bears mentioning.  Plaintiffs lean heavily on the Commission's use of the phrase "may have originated" in arguing that the SEC's interpretation stretches the statute beyond its bounds.  From Plaintiffs' viewpoint, the Rule could have properly been written to require due diligence and reporting from issuers that have "reason to believe" their minerals "*did originate*" in the Covered Countries, but the Commission's imposition of those obligations on issuers that have "reason to believe" their minerals "*may have originated*" in the Covered Countries is, according to Plaintiffs, simply a step too far.  (*See* Pls.' Reply at 20).  The Court does not agree.  Indeed, the Court is hard-pressed to conjure up a scenario in which an issuer, following its reasonable country of origin inquiry, *would* have reason to believe that its minerals "may have originated" in the Covered Countries, but *would not* have reason to believe that its

minerals "did originate" in the Covered Countries.[21]   Insofar as there is any discernible difference between these two articulations, it strikes the Court as a semantic one.

In sum, therefore, the Court concludes that the Commission's adoption of the reasonable country of origin inquiry is based on a reasonable and permissible construction of Section 1502, and is not otherwise arbitrary or capricious in contravention of the APA.

### 6.   The Rule's Coverage Of Issuers That "Contract to Manufacture" Products

Next, Plaintiffs argue that the Commission's extension of the Final Rule to issuers that only "contract to manufacture" products with necessary conflict minerals, rather than limiting the Rule's coverage to issues that themselves "manufacture" such products, was contrary to law and arbitrary and capricious.   More specifically, Plaintiffs insist that the Commission's interpretation fails at *Chevron* Step One because the statute plainly limits its application to "manufacturing" issuers.   Plaintiffs also argue that because "the SEC erroneously felt itself bound to adopt the contrary conclusion, the SEC's interpretation is entitled to no deference." (Pls.' Brief at 49).   For its part, the Commission counters that it properly construed Section 1502 as ambiguous as to whether issuers that "contract to manufacture" should be covered by its Rule, and in its view, the SEC reasonably and appropriately answered that question in the affirmative.

---

[21]      Plaintiffs' counsel attempted to paint an example of such a hypothetical situation during oral argument.   As Plaintiffs' scenario went, if an issuer traced its minerals to a smelter that, over the course of the previous five years, had sourced approximately 55% of its minerals from Covered Countries, then in that case, the issuer would have reason to believe that its particular minerals "did originate" in the Covered Countries.   By contrast, if the same smelter informed the issuer that over the course of the previous five years, it sourced only 5% of its minerals from Covered Countries, Plaintiffs posited that the issuer *would not* have reason to believe that its minerals "did originate" in the Covered Countries, but that it *would* have reason to believe that its minerals "may have originated" in the Covered Countries.   As the Commission responded, however, in the latter scenario, one could still credibly and reasonably argue that the issuer had reason to believe its minerals "did originate" in the Covered Countries.   The Court agrees and finds that even under Plaintiffs' hypothetical, the two competing articulations effectively amount to a distinction without a difference.

To start with, the Court gleans no clear and plain meaning from the statute.  In pressing their interpretation, Plaintiffs rely upon the "plain text" of the statute, emphasizing that Congress limited its definition of "person" covered by the conflict minerals disclosures to issuers using necessary conflict minerals in "a product manufactured by such person."  *See* 15 U.S.C. § 78m(p)(2)(B).  From there, Plaintiffs contrast § 78m(p)(2)(B) with § 78m(p)(1)(A), wherein Congress directed covered issuers to submit a report describing products "manufactured or contracted to be manufactured that are not DRC conflict free," insisting that Congress's use of "different terms . . . generally implies that different meanings were intended."  *See United States v. Bean*, 537 U.S. 71, 76 n.4 (2002).  If Congress wanted the statute to also cover entities that only "contract to manufacture products" containing necessary conflict minerals, Plaintiffs argue, Congress knew how to say so.  But the Commission rejoins that Congress's failure to expressly include issuers that "contract to manufacture" in the definition of "person" under § 78m(p)(2)(B) should not be read as a prohibition on the SEC's interpretation, but simply as an indication that Congress decided "not to mandate any solution" and "to leave the question to agency discretion."  *See Catawba County v. EPA*, 571 F.3d 20, 36 (D.C. Cir. 2009) ("[T]hat Congress spoke in one place but remained silent in another, as it did here, rarely if ever suffices for the direct answer that *Chevron* step one requires.").  In addition, Plaintiffs' interpretation does not satisfactorily explain why Congress required products "contracted to be manufactured," 15 U.S.C. § 78m(p)(1)(A)(ii), to be included in the Conflict Minerals Report.  The fact that both sides credibly wield competing canons of statutory interpretation suggests that Congress did not plainly answer this particular question in enacting Section 1502.

Nor is the statute's legislative history any more conclusive.  Plaintiffs point out that an earlier version of the bill would have covered an issuer if necessary conflict minerals were

included in "a product of such person," 156 Cong. Rec. S3103 (May 4, 2013) (amendment by

Sen. Brownback), while the final version of the bill was amended to only apply to an issuer if

necessary conflict minerals were included in "a product *manufactured* by such person, 156 Cong.

Rec. 3866 (May 18, 2010) (amendment by Sen. Brownback) (emphasis added).  As Plaintiffs

interpret this development, the legislative history demonstrates that Congress intended to limit

the statute to manufacturers.  (Pls.' Brief at 47).  The SEC reads things differently, insisting that

this amendment is equally consistent with its own reading of the statute, insofar as Congress

sought to exclude pure retailers from the Rule's coverage, while still capturing issuers that have

some role in the manufacturing of their products.  (Def.'s Brief at 54 n.10).  On balance, either

takeaway is plausible.

Most fundamentally, however, the statute's ambiguity stems from the ambiguity inherent

in the term "manufacture" itself.   Indeed, our Circuit has expressly characterized the word

"manufacture" as "an inherently ambiguous term," noting that "[f]ew if any authorities define

manufacturing as limited solely to fabrication." *United States v. W. Elec. Co.*, 894 F.2d 1387,

1390-91 (D.C. Cir. 1990) ("We do not find design and development contrary to the 'plain

meaning' of the word 'manufacture.'"); *see also Charles Peckat Mfg. Co. v. Jarecki*, 196 F.2d

849, 851 (7th Cir.), *cert. denied*, 344 U.S. 875 (1952) (finding a patent holder that contracted

with an independent fabricator to be a "manufacturer" for purposes of an excise tax).  Thus, even

if the Court were to agree with Plaintiffs' contention that the statute plainly "applies only to

manufacturers," (Pls.' Brief at 46), this would not be the end of the matter because, under our

Circuit's precedent, that term is inherently ambiguous and might well include entities that

contract out the manufacture of products with necessary conflict minerals.  Consequently, the

Court simply cannot say that Congress directly, let alone clearly, spoke to this issue, which means that Plaintiffs cannot prevail under *Chevron* Step One.[22]

The Court next turns to what should be a familiar argument at this point—Plaintiffs' contention that the Commission wrongly believed its interpretation compelled by Congress. And despite the old adage, it seems the third time is not a charm here. In advancing this argument, Plaintiffs point to the following statement by the SEC in the Adopting Release: "[W]e believe the statutory intent to include issuers that contract to manufacture their products is clear based on the statutory obligation for issuers to describe in their Conflict Minerals Report products that are manufactured and contracted to be manufactured." (Pls.' Reply at 17) (quoting 77 Fed. Reg. at 56,291). Plaintiffs also highlight the SEC's remark that its approach "is based on [its] interpretation of the statute in light of [its] understanding of the statutory intent and a reading of the statute's text." (*Id.* at 17-18) (quoting 77 Fed. Reg. at 56,345). But these statements do not reveal that the Commission felt compelled to adopt the approach that it did; rather, they indicate that the SEC sought to exercise its judgment in a manner consistent with the statute's underlying purpose. Moreover, while Plaintiffs seem to seize upon the Commission's use of the word "clear" in describing its understanding of statutory intent, our Circuit has squarely rejected this angle before. *See Ass'n of Private Sector Colls. & Univs.*, 681 F.3d at 445 ("[I]t would be a stretch, to say the least, to hold that the Department's use of the word 'clear' demonstrates that

---

[22]     The Court also finds it notable that, during the rulemaking process, several of the Plaintiffs in this case appeared to agree with the Final Rule's inclusion of issuers that "contract to manufacture" products. (*See* JA273 (letter from Business Roundtable) ("[T]he Provision should apply to both issuers that manufacture their own products and issuers who contract to manufacture . . ."); JA383 (letter from NAM) ("The rules should apply to issuers that contract to manufacture products only if the issuer directly specifies the conflict minerals as an ingredient, feature, or component of the product or process."). Potential waiver issues aside, Plaintiffs' contrary positions during the notice-and-comment period strongly suggest that, at a minimum, the statute is silent or ambiguous on this particular point.

the agency meant to suggest that its regulatory interpretation was 'compelled by Congress.'"). The Court thus concludes that the SEC exercised its judgment in resolving this question, and forges ahead to *Chevron* Step Two.

On this last point, Plaintiffs argue, in summary fashion, that "the SEC's interpretation would be arbitrary and capricious even if the statute were ambiguous and the agency had exercised discretion." (Pls.' Reply at 19). More specifically, Plaintiffs assert that the Commission erred in failing to determine that its extension of the Rule to issuers that "contract to manufacture" would "yield any benefits." (*Id.*). As best as the Court can tell, Plaintiffs are essentially reprising their earlier argument regarding the SEC's failure to independently confirm that the Final Rule would achieve the humanitarian benefits identified by Congress, and the Court rejects that argument for the reasons already stated. Otherwise, the Court is convinced that the Rule's application to issuers that "contract to manufacture" is an amply reasonable construction of Section 1502. This is particularly true given the guidance supplied by the SEC in the Adopting Release, wherein the Commission emphasized its focus on the degree of influence and control that an issuer exercises over the manufacturing process, effectively excluding "pure retailers" from the scope of the Rule. *See* 77 Fed. Reg. at 56,291.[23]

The Court thus concludes that the SEC's application of the Conflict Minerals Rule to issuers that "contract to manufacture" products is a perfectly permissible construction of Section 1502, and is not otherwise arbitrary, capricious, or contrary to law.

---

[23] For these same reasons, Plaintiffs' concerns that the Rule will require many non-manufacturers to create "supply-chain monitoring processes and mechanisms . . . from scratch," (Pls.' Brief at 49), largely miss the mark.

### 7.   **The Commission's Adoption Of Different Phase-In Periods**

As a final APA challenge to the Conflict Minerals Rule, Plaintiffs argue that the Commission's decision to adopt a four-year phase-in period for small companies, while only allowing for a two-year phase-in period for large companies, is arbitrary and capricious.  On this point, Plaintiffs begin with the assertion that "many smaller companies are part of larger companies' supply chains."  (Pls.' Brief at 50) (quoting 77 Fed. Reg. at 56,361).  In turn, they fault the Commission's use of a shorter phase-in period for smaller companies because "[i]f small companies cannot comply with the rule for four years, and large companies will have to rely on small companies to comply," then it is unreasonable to expect larger companies to be able to comply within two years.  (*Id.*).  The Commission maintains otherwise.  As explained by the SEC, its decision to grant smaller companies a longer transition period stemmed from the Commission's belief that such "issuers may lack the leverage to obtain detailed information regarding the source of a particular conflict mineral."  77 Fed. Reg. at 56,323.  Despite Plaintiffs' protestations, the Court cannot conclude that this determination was unreasonable.

It is undoubtedly true, as Plaintiffs assert, that some large issuers rely upon smaller issuers covered by the Rule as part of their supply chains.  In those circumstances, the disparate transition periods may pose some unique difficulties that might not otherwise exist.  But Plaintiffs' concerns also seem overinflated to a large extent.  To be clear, the temporary transition period does not excuse issuers from complying with the Final Rule altogether—it simply allows issuers that are ultimately unable to determine the source of their minerals to identify their products as "DRC conflict undeterminable," rather than as having "not been found to be 'DRC conflict free.'"  *See id.* at 56,320-56,324.  All covered issuers, large and small, must still undertake a reasonable country of origin inquiry and, if necessary, the ensuing due diligence efforts required by the Rule.  So even smaller issuers will be sourcing their minerals and tracing

their supply chains during the transition periods, and larger issuers can still rely upon information gleaned from those efforts in connection with their own compliance practices. Simply put, while the Court does not necessarily disagree with Plaintiffs that it might have been equally reasonable for the SEC to adopt a uniform transition period for all covered issuers, this does not mean that it was unreasonable for the SEC to bifurcate the phase-in period, and the Court declines to substitute its judgment on this question for the Commission's.[24]

## B. Plaintiffs' First Amendment Challenge

Along with their claims under the APA, Plaintiffs also mount a separate constitutional challenge, arguing that the disclosure requirements under the Final Rule and Dodd-Frank § 1502 improperly compel "burdensome and stigmatizing speech" in violation of the First Amendment. (*See* Pls.' Brief at 51-55). As articulated in their briefing, Plaintiffs argued that the Rule and the underlying statute infringe upon the First Amendment "by compelling companies to publicly state on their own websites, as well as in SEC filings, that certain of their products are 'not DRC conflict free.'" (*Id.* at 51-52). In other words, Plaintiffs appeared, at first, to be challenging as unconstitutional *both* the disclosures to be filed with the Commission, *and* the requirement that companies make those disclosures publicly available on their own websites. During oral argument, however, Plaintiffs' counsel confirmed that the relief they seek is limited to the latter issue—the provisions of Section 1502 and the Final Rule that obligate companies to post conflict minerals disclosures on their own websites. In turn, the Court confines its analysis accordingly and does not reach the question of whether the statutory and regulatory provisions requiring

---

[24] In crafting this distinction, the SEC also summarized one commentator's belief that "although smaller reporting companies may lack leverage, this disadvantage may be reduced through the influence exerted over their suppliers by larger issuers that use the same supplier base and that have more leverage to request such information." 77 Fed. Reg. at 56,323 n.570. While concededly not a perfect fit in every circumstance, the Court can certainly see the trickle-down logic underlying the Commission's approach.

disclosure of conflict minerals information to the SEC, and solely to the SEC—whether through

a Form SD or a Conflict Minerals Report—run afoul of the First Amendment.

### 1.   Notice of Plaintiffs' Constitutional Challenge to the United States

Before the Court can turn to the merits of Plaintiffs' constitutional claim, a threshold

procedural issue requires attention.  Pursuant to Title 28 of the United States Code:

> In any action, suit or proceeding in a court of the United States to which the
> United States or any agency, officer or employee thereof is not a party, wherein
> the constitutionality of any Act of Congress affecting the public interest is drawn
> in question, the court shall certify such fact to the Attorney General, and shall
> permit the United States to intervene . . . on the question of constitutionality.

28 U.S.C. § 2403(a).  Federal Rule of Civil Procedure 5.1, in turn, implements the provisions of

§ 2403(a), requiring any party "drawing into question the constitutionality of a federal . . .

statute," as Plaintiffs do here, to promptly "file a notice of constitutional question" with the Clerk

of Court and to "serve the notice and paper on the Attorney General of the United States."  FED.

R. CIV. P. 5.1(a).  Thereafter, the United States, through the Attorney General, is afforded sixty

days to intervene in the action to defend the constitutionality of the challenged statute.  *See id.*

5.1(c).   "Th[is] certification requirement protects the public interest by ensuring that the

Executive Branch can make its views on the constitutionality of federal statutes heard."  *Okla. ex*

*rel. Edmondson v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008) (citing 7C CHARLES ALAN

WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1915

(2d ed. 1986)).  While not addressed in either side's briefing, the Court independently raised this

subject with the parties at the hearing.

As an initial matter, while the SEC is a defendant in this action and can legitimately be

characterized as an "agency" of the United States for certain purposes, neither Plaintiffs nor the

Commission contends that the SEC's presence in this lawsuit dispenses with these notice

requirements to the United States.  And even if this were not true, the Court would be reluctant to so find, given that the SEC is an independent agency that is represented in this litigation by the Commission's own lawyers, and not by the U.S. Department of Justice. *See SEC v. Fed. Labor Relations Auth.*, 568 F.3d 990, 997-98 (D.C. Cir. 2009) (Kavanaugh, J., concurring) (explaining that the Attorney General does not have dispositive legal control over independent agencies).  As a result, the Court holds that Plaintiffs were obligated to provide notice under 28 U.S.C. § 2403(a) and Federal Rule 5.1.  *Cf. Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, --- U.S. ---, 130 S. Ct. 3138, 3147-49 (2010) (noting the Attorney General's intervention to defend the constitutionality of the Sarbanes-Oxley Act of 2002, even though the Public Company Accounting Oversight Board, whose members were appointed by the SEC and were "Officers of the United States," was a defendant in the action and was represented by counsel).  During the hearing, Plaintiffs suggested that they have satisfied these notice requirements by serving a copy of their Amended Petition for Review (filed with the Court of Appeals) on the United States Attorney General.  While true, that petition did not expressly indicate that Plaintiffs were challenging the constitutionality of 15 U.S.C. § 78m(p) and therefore cannot satisfy the requirements of 28 U.S.C. § 2403(a) and Federal Rule 5.1. (*See* D.C. Circuit, No. 12-1422, Am. Pet. for Review (filed Oct. 22, 2012)).[25]  And while Plaintiffs later articulated the constitutional claim more distinctly in their Statement of Issues and in other filings, there is nothing on the Court of Appeals' docket (nor on this Court's docket) to indicate that any subsequent

---

[25]      Nor would this step have complied with Federal Rule of Appellate Procedure 44(a), which requires that a party challenging the constitutionality of a federal statute to "give written notice to the circuit clerk immediately upon the filing of the record or as soon as the question is raised in the court of appeals," and that the clerk "then certify that fact to the Attorney General." FED. R. APP. P. 44(a); *see also Baker v. GTE North, Inc.*, 110 F.3d 28, 30 (7th Cir. 1997) ("This [requirement] means something more than just making an argument in the brief; otherwise Rule 44 would be superfluous.").

submissions were ever served upon the Attorney General. Nor does the Court find that the SEC's reported "consultation" with the Department of Justice during this litigation accomplished or dispensed with the mandatory notice to be served upon the Attorney General.

That being said, the failure to provide notice under 28 U.S.C. § 2403(a) and Federal Rule 5.1 does not deprive the Court of jurisdiction to hear the case. *See Tonya K. v. Bd. of Educ.*, 847 F.2d 1243, 1247 (7th Cir. 1988); *Ga. Ass'n of Retarded Citizens v. McDaniel*, 855 F.2d 805, 810 n.3 (11th Cir. 1988). And Federal Rule 5.1 does not specify when certification must be made to the Attorney General, other than "before a final judgment holding the statute unconstitutional." FED. R. CIV. P. 5.1(c). Thus, the Court "may reject a constitutional challenge to a statute at any time." FED. R. CIV. P. 5.1(c) advisory committee's note (2006); *see also* 1 JAMES WM. MOORE, ET AL., MOORE'S FEDERAL PRACTICE ¶ 5.1.06[2] (3d ed. 2013) (explaining that a court may enter "final judgment or an order rejecting the constitutional challenge to the statute" without awaiting the Attorney General's intervention determination under Federal Rule 5.1). Insofar as the Court rejects Plaintiffs' First Amendment challenge for the reasons that follow, the Court will certify a copy of this Opinion and the accompanying Order to the Attorney General, thereby satisfying the notice requirements of 28 U.S.C. § 2403(a) and Federal Rule 5.1. FED. R. CIV. P. 5.1(b), (c); *see also Ga. Ass'n*, 855 F.2d at 810 n.3; *Buchanan Cnty. v. Blankenship*, 545 F. Supp. 2d 553, 555 n.3 (W.D. Va. 2008); *Rhinebarger v. Orr*, 657 F. Supp. 1113, 1115 n.1 (S.D. Ind. 1987). The Court will entertain a motion for reconsideration filed by the United States if the Attorney General determines that intervention is still necessary.

2. **Applicable Standard of Review**

At the outset, it is well settled that the "[t]he First Amendment protects against government infringement on 'the right to speak freely and the right to refrain from speaking at all.'" *United States v. Philip Morris USA, Inc.*, 566 F.3d 1095, 1142 (D.C. Cir. 2009) (per curiam) (quoting *Wooley v. Maynard*, 430 U.S. 705, 714 (1977)).  In other words, the fact that the challenged disclosures *compel*, rather than *restrict*, speech is of no consequence to the Court's analysis; the First Amendment's safeguards adhere just the same.  *See id.*; *see also Full Value Advisors, LLC v. SEC*, 633 F.3d 1101, 1108 (D.C. Cir. 2011).  On this much, at least, the parties agree.  But from there, as is often the case in the First Amendment arena, the parties quarrel over the appropriate standard of review governing the Court's analysis.

Before plunging into that issue, however, the Court pauses to clearly and specifically summarize the disclosure scheme created by Congress and the SEC through Dodd-Frank § 1502 and the Final Rule, respectively.

Under Section 1502, any covered issuer "shall make available to the public on [its] Internet website . . . the information disclosed by such person under subparagraph (A)."  15 U.S.C. § 78m(p)(1)(E).  Subparagraph (A) of the statute, in turn, requires an issuer to "disclose annually . . . whether conflict minerals that are necessary" to the functionality or production of its products "did originate in the [DRC] or an adjoining country."  *Id.* § 78m(p)(1)(A).  Further, "in cases in which such conflict minerals did originate in any such country," the issuer must also "submit to the Commission a report that includes":

   (i) a description of the measures taken by the person to exercise due diligence on
        the source and chain of custody of such minerals, which measures shall
        include an independent private sector audit of such report . . . ; and

   (ii) a description of the products manufactured or contracted to be manufactured
        that are not DRC conflict free . . . , the entity that conducted the independent
        private sector audit . . . , the facilities used to process the conflict minerals, the

country of origin of the conflict minerals, and the efforts to determine the mine or location of origin with the greatest possible specificity.

*Id.* § 78m(p)(1)(A)(i)–(ii).  These are the disclosures Congress mandated by statute.

The Final Rule's provisions mirror these requirements.  Depending on the results of its reasonable country of origin inquiry, an issuer must: (a) file a Form SD with the Commission, "briefly describ[ing] the reasonable country of origin inquiry it undertook in making its determination [as to the origin of its minerals] and the results of the inquiry it performed," and "must disclose this information on its publicly available Internet Web site"; and/or (b) "file a Conflict Minerals Report as an exhibit to its [Form SD] and provide that report on its publicly available Internet Web site."  77 Fed. Reg. at 56,362-56,363.  The Conflict Minerals Report, if required, must include "[a] description of the measures the registrant has taken to exercise due diligence on the source and chain of custody of [its] conflict minerals," as well as a description of the issuer's products "that have not been found to be 'DRC conflict free,' . . . the facilities used to process the necessary conflict minerals in those products, the country of origin of the necessary conflict minerals in those products, and the efforts to determine the mine or location of origin with the greatest possible specificity."  *Id.* at 56,363-56,364.

Simply stated, both the statute and the Rule require issuers to submit disclosures and reports to the Commission regarding their conflict minerals sourcing practices, and to thereafter disclose such reports—whether in the form of a Form SD or a Conflict Minerals Report—on their own public websites.

With this background in mind, the Court turns to the appropriate standard of review.  To begin with, Plaintiffs' challenge to the provisions requiring issuers to publicly disclose information on their own websites—the thrust of their claim here—calls for a different constitutional analysis than would a challenge to those aspects of Section 1502 and the Final

Rule that merely call for disclosures to the Commission.  The disclosures that must be made to the SEC, standing alone, would be subject to a more relaxed level of scrutiny, particularly given that the disclosures are quite arguably made in the realm of securities regulation.  *See, e.g.*, *Full Value Advisors*, 633 F.3d at 1108-09 (applying rational basis review to compelled disclosures "to the Commission alone"); *SEC v. Wall St. Publ'g Inst., Inc.*, 851 F.2d 365, 373 (D.C. Cir. 1988) ("[T]he exchange of information regarding securities is subject only to limited First Amendment scrutiny."); *see also Pharm. Care Mgmt. Ass'n v. Rowe*, 429 F.3d 294, 316 (1st Cir. 2005) (applying rational basis test to "routine disclosure of economically significant information designed to forward ordinary regulatory purposes").  But Plaintiffs' challenge is not so framed. Rather, they seek to invalidate those aspects of Section 1502 and the Final Rule that mandate public disclosure of this information on company websites.  And in the Court's view, these disclosures trigger a more stringent constitutional analysis.

The SEC urges the Court to apply the "rational basis" standard derived from the Supreme Court's decision in *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626 (1985).  Under the *Zauderer* standard, "'purely factual and uncontroversial' disclosures are permissible if they are 'reasonably related to the State's interest in preventing deception of consumers,' provided the requirements are not 'unjustified or unduly burdensome.'"  *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1212 (D.C. Cir. 2012) (quoting *Zauderer*, 471 U.S. at 651).  But Commission counsel conceded at oral argument that the disclosures are not aimed at preventing misleading or deceptive speech—a concession that, under this Circuit's precedent, removes this case from the *Zauderer* framework.  *Id.* at 1214 (explaining that *Zauderer* is limited to cases in which "the government shows that, absent a warning, there is a self-evident—or at least 'potentially real'—danger that an advertisement will mislead

consumers"). Plaintiffs, on the other hand, argue that strict scrutiny governs, pursuant to which the disclosures must be "narrowly drawn" to serve a "compelling government interest." *See, e.g.*, *Brown v. Entm't Merchs. Ass'n*, --- U.S. ---, 131 S. Ct. 2729, 2738 (2011). Alternatively, Plaintiffs insist that the regulation must at least survive "intermediate scrutiny," whereby the government must establish that the disclosures "directly and materially advance[]" a "substantial" government interest. *See R.J. Reynolds*, 696 F.3d at 1212 (citing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557, 566 (1980)); *see also Spirit Airlines, Inc. v. Dep't of Transp.*, 687 F.3d 403, 415 (D.C. Cir. 2012).

On balance, given the commercial nature of the disclosures at issue, the Court concludes that it must apply the *Central Hudson* "intermediate scrutiny" standard. While some circuits apply strict scrutiny once the case is found to fall outside of the *Zauderer* standard,[26] our Circuit has rejected this dichotomous approach, holding instead that in evaluating the constitutionality of compelled commercial speech, any "burdens imposed . . . receive a lower level of scrutiny from courts." *RJ Reynolds*, 696 F.3d at 1217 (quoting *Philip Morris*, 566 F.3d at 1142-43). Thus, after finding *Zauderer* inapplicable, the D.C. Circuit in *RJ Reynolds* applied "the intermediate standard set forth in *Central Hudson*." *Id.* This Court is bound to do the same.[27]

---

[26]     *See Disc. Tobacco City & Lottery, Inc. v. United States*, 674 F.3d 509, 554 (6th Cir. 2012) ("If a commercial-speech disclosure requirement fits within the framework of *Zauderer* and its progeny, then we apply a rational-basis standard. If it does not, then we . . . apply strict scrutiny.") (internal citations omitted); *Entm't Software Ass'n v. Blagojevich*, 469 F.3d 641, 651-52 (7th Cir. 2006) (analyzing whether *Zauderer* test or strict scrutiny applied to compelled commercial speech).

[27]     In pressing for strict scrutiny, Plaintiffs argue—albeit weakly and in relatively conclusory fashion—that the disclosures are not "commercial" in nature. Plaintiffs seem to dispute the commercial character of the disclosures because, in their view, the "statements [are] pregnant with political judgments and connotations regarding events in foreign countries." (Pls.' Brief at 52). This argument is unavailing. First, commercial speech is not limited to purely economic speech or "speech proposing a commercial transaction," *Cent. Hudson*, 447 U.S. at 561-62; rather, our Circuit has made clear that commercial speech also encompasses "material

3.   **Application of *Central Hudson* Intermediate Scrutiny**

Under *Central Hudson*'s test, a challenged regulation survives First Amendment scrutiny so long as: (1) the asserted "government interest is substantial," (2) the regulation "directly advances the government interest asserted," and (3) "the fit between the ends and the means chosen to accomplish those ends is not necessarily perfect, but reasonable." *Spirit Airlines*, 687 F.3d at 415 (quoting *Cent. Hudson*, 447 U.S. at 566 (1980), and *Pearson v. Shalala*, 164 F.3d 650, 656 (D.C. Cir. 1999)); *see also R.J. Reynolds*, 969 F.3d at 1212.   Plaintiffs do not contest the first of these elements.   They expressly recognize that "the government's interest in promoting peace and security in the DRC is substantial, even compelling." (*See* Pls.' Brief at 53).   In so doing, Plaintiffs rightly articulate the underlying governmental interest as the promotion of peace and security in the DRC and its surrounding areas. *See* 77 Fed. Reg. at 56,275-56,276.   Plaintiffs do, however, take issue with the remaining elements of *Central Hudson*, which the Court addresses in turn.

In challenging the second element, Plaintiffs argue that "the statute and rule fail to directly and materially advance" Congress's interest in promoting peace and security in the DRC. (Pls.' Brief at 53).   According to Plaintiffs, "[i]t is difficult to think of a *less* direct way to benefit the DRC than imposing this disclosure requirement on U.S. public companies." (*Id.* at 54) (emphasis in original).   To satisfy this prong, the government must show that the restriction

---

representations about the efficacy, safety, and quality of the advertiser's product, and other information asserted for the purpose of persuading the public to purchase the product." *Philip Morris*, 566 F.3d at 1143 (collecting cases).   Moreover, simply because a disclosure "links a product to a current public debate," the disclosure is "not thereby entitled to the constitutional protection afforded noncommercial speech." *Spirit Airlines*, 687 F.3d at 412 (quoting *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68 (1983)).   Thus, in arguing that the disclosures cannot be deemed "commercial" simply by virtue of their relation to the "public debate" surrounding the DRC conflict, Plaintiffs simply miss the mark.   Otherwise, the Court has no trouble concluding that the disclosures—which consist of information regarding a company's supply chain and sourcing practices for its products—comfortably fit within the realm of commercial speech.

"directly and materially advances the asserted governmental interest." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001).  As Plaintiffs correctly note, this burden "is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree."  *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995); *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *RJ Reynolds*, 969 F.3d at 1218-19.  The Supreme Court has also explained, however, that it does not require "empirical data . . . [to] come accompanied by a surfeit of background information . . . . We have permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even . . .  based solely on history, consensus, and simple common sense."  *Lorillard*, 533 U.S. at 555; *see also Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 628 (1995).  Further, while "'Congress must base its conclusions upon substantial evidence' . . . that 'substantiality is to be measured' by a 'deferential' standard . . . 'lest [the courts] infringe on traditional legislative authority to make predictive judgments.'"  *Nat'l Ass'n of Mfrs. v. Taylor*, 582 F.3d 1, 15 (D.C. Cir. 2009) (quoting *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195-96 (1997)).

Distilling all of these principles and applying them collectively, the Court finds that the conflict minerals disclosure scheme surpasses the second *Central Hudson* hurdle, by "directly and materially advanc[ing]" Congress's interest in promoting peace and security in and around the DRC. In arguing otherwise, Plaintiffs assail the disclosure scheme as lacking sufficient empirical support on Congress's part.  But this argument is largely unavailing because it effectively ignores the foreign relations context in which Congress enacted Section 1502.  As the Supreme Court recently made clear, "[i]n this context, conclusions must often be based on

informed judgment rather than concrete evidence, and that reality affects what we may reasonably insist on from the Government." *Holder v. Humanitarian Law Project*, --- U.S. ---, 130 S. Ct. 2705, 2727-28 (2010).   Put another way, "because of the changeable and explosive nature of contemporary international relations, . . . Congress . . . must of necessity paint with a brush broader than that it customarily wields in domestic areas." *Id.* (quoting *Zemel v. Rusk*, 381 U.S. 1, 17 (1965)).   Further, while "concerns of national security and foreign relations do not warrant abdication of the judicial role," and while the Court does "not defer to the Government's reading of the First Amendment, even when such interests are at stake," the Court must nevertheless recognize that "when it comes to collecting evidence and drawing factual inferences in this area, 'the lack of competence on the part of courts is marked.'"   *Id.* at 2727 (quoting *Rostker v. Goldberg*, 453 U.S. 57, 65 (1981)).   Indeed, judicial review is particularly deferential in areas "at the intersection of national security, foreign policy, and administrative law." *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007); *see also Citizens for Peace in Space v. City of Colo. Springs*, 477 F.3d 1212, 1221-22 (10th Cir. 2007) ("Courts have historically given special deference to other branches in matters relating to foreign affairs, international relations, and national security.").[28]

---

[28]      In pressing their argument that Congress was required to produce more comprehensive empirical evidence, Plaintiffs rely heavily on our Circuit's reasoning in *RJ Reynolds.* Given the distinctions between *RJ Reynolds* and the case at bar, however, Plaintiffs simply place too much emphasis on its holding.  Most significantly, this case concerns disclosures that implicate foreign policy interests that, for the reasons just explained, warrant much greater deference to Congress's informed and predictive judgments than did the graphic cigarette warnings at issue in *RJ Reynolds*.   Further, the governmental interest invoked in *RJ Reynolds*—"reducing smoking rates," "discourag[ing] nonsmokers from initiating cigarette use," and "encourag[ing] current smokers to consider quitting," *see* 696 F.3d at 1218—was far more specific than Congress's objective here to "promote peace and security" in the DRC.  Given this, it makes less sense to demand such particularized empirical evidence from Congress.  Perhaps sensing this, Plaintiffs sought to recast the underlying interest in their reply brief as "ameliorat[ing] the violent conflict in the DRC," arguing, in turn, that Congress failed to rely upon sufficient evidence that the

In enacting Section 1502, Congress found that "the exploitation and trade of conflict minerals originating in the [DRC] is helping to finance conflict characterized by extreme levels of violence in the eastern [DRC], particularly sexual- and gender-based violence, and contributing to an emergency humanitarian situation therein."  Dodd-Frank § 1502(a), 124 Stat. 2213.  Congress believed that it could not "begin to solve the problems of eastern Congo without addressing where the armed groups are receiving their funding, mainly from the mining of a number of key conflict minerals."  156 Cong. Rec. S3817 (May 17, 2010) (statement of Sen. Durbin).  In turn, Congress found that requiring disclosure from companies using these minerals was "a reasonable step to shed some light on this literally life-and-death issue, and it encourages companies using these minerals to source them responsibly."  *Id.*  In so concluding, Congress relied upon the United Nations Group of Experts, which had "reported for years how parties to the conflict in eastern Congo continue to benefit and finance themselves by controlling mines or taxing trading routes for these minerals."  156 Cong. Rec. S3976 (May 19, 2010) (statement of Sen. Feingold); *see also* U.N. Security Council Resolution 1896, at ¶ 14 (Dec. 7, 2009); U.N. Security Council Resolution 1857, at ¶ 15 (Dec. 22, 2008).  The State Department, as well, believed that the disclosure scheme would directly promote peace and security in the DRC. *See, e.g.*, Statement of Secretary of State Hillary Clinton (July 22, 2010), *available at* http://www.state.gov/secretary/rm/2010/07/145039.htm ("President Obama has now signed into law a measure that will require corporations to publicly disclose what they are doing to ensure that their products don't contain these minerals . . . . This is one of several steps we are taking to

---

disclosure scheme would directly achieve this more specific (and heightened) objective. (*See* Pls.' Reply at 26-27).  But Congress's objective was to "promote peace and security" in the DRC more generally, as Plaintiffs themselves initially acknowledged, (*see* Pls.' Brief at 52), and for the reasons explained herein, the Court finds sufficient support for Congress's predictive and informed judgment that the disclosure scheme would directly advance that goal.

stop this illicit and deadly trade.").  It also bears emphasis that Congress was not working from a blank slate on this subject.  Congress previously considered (but did not pass) the Congo Conflict Minerals Act of 2009, which would have required the same sort of disclosures at issue here. Further, Congress *did* pass the Democratic Republic of the Congo Relief, Security, and Democracy Promotion Act of 2006 several years earlier, reiterating the policy of the United States to "make all efforts to ensure . . . [the] responsible and transparent management of natural resources across the [DRC]."  DRC Act § 108(a)(1), 109 Pub. Law No. 456, 120 Stat. 3386.  At a minimum, this record establishes that, contrary to Plaintiffs' argument, Congress's passage of Section 1502 was not based on "mere speculation or conjecture," *see Edenfield*, 507 U.S. at 770, but derived from its "informed judgment," *Humanitarian Law Project*, 130 S. Ct. at 2728, and, to some degree, "history, consensus, and simple common sense," *Lorillard*, 533 U.S. at 555.[29]

Turning to the third prong of *Central Hudson*, Plaintiffs contest that the disclosure scheme is a reasonable fit to accomplish Congress's objective in promoting peace and security in the DRC.  They argue that "there are many less speech-restrictive (and more direct) ways the government could pursue its goal of benefitting the DRC."  (Pls.' Brief at 54).  On this point, it is well established that "'the least restrictive means' is not the standard; instead, the case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends.'"  *Lorillard*, 533 U.S. at 566 (quoting *Fla. Bar*, 515 U.S. at 628); *see also Nat'l Cable & Telecomms. Ass'n v. FCC*, 555 F.3d 996, 1002 (D.C. Cir. 2009) ("The government does

---

[29]     The Court also observes that this was not a situation in which "Congress'[s] justification for a statute rested on 'economic' analysis that was susceptible to empirical evidence."  *Taylor*, 582 F.3d at 16.  Rather, Congress's passage of the disclosure scheme was based, at least in part, on "a value judgment based on the common sense of the people's representatives," and as our Circuit has held, the fact that its judgment "reflects unprovable assumptions about what is good for the people . . . is not a sufficient reason to find that statute unconstitutional."  *Id.* (quoting *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 62 (1973)).

not have to show that it has adopted the least restrictive means for bringing about its regulatory objective."). Put another way, the government need not "demonstrate a perfect means-ends fit," nor must it "satisfy a court that is has chosen the best conceivable option." *Id.* Rather, "the only condition is that the regulation be proportionate to the interests sought to be advanced." *Id.*; *see also Pearson*, 164 F.3d at 657 (describing the question as whether there is a "reasonable fit between the government's goals and the means chosen to advance those goals"). Framed appropriately, the Court holds that the disclosure scheme meets this requirement.

In many ways, the thrust of Plaintiffs' challenge to the disclosure scheme takes root in this final element of the *Central Hudson* test. That is, by focusing on those aspects of Section 1502 and of the Final Rule that require disclosures to be published on company websites, Plaintiffs are essentially challenging the *means* Congress has chosen to achieve its objectives. To this end, Plaintiffs insist that the disclosure scheme infringes upon the First Amendment "by compelling companies to publicly state on their own websites . . . that certain of their products are 'not DRC conflict free.'" (Pls.' Brief at 52). But in so arguing, Plaintiffs distort the nature and extent of the disclosure requirements at issue. To be clear, all that Section 1502 and the Final Rule require is that companies publish copies of their Form SD's and/or Conflict Minerals Reports—i.e., verbatim copies of disclosures already prepared for and filed with the Commission—on their websites. *See* 15 U.S.C. § 78m(p)(1)(E); 77 Fed. Reg. at 56,362-56,363. Neither Section 1502 nor the Final Rule requires companies to separately or conspicuously publish on their website a list of products that have not been found to be "DRC conflict free," as Plaintiffs intimate, nor must companies physically label their products as such on the packaging itself. 77 Fed. Reg. at 56,323. Rather, companies can comply with these disclosure requirements simply by making their conflict minerals disclosures available on the same

webpage that houses other required SEC filings, such as annual reports, proxy statements, and other investor-related information.  This approach qualifies as a "reasonable fit" under the *Central Hudson* standard.[30]

Plaintiffs take particular issue with the label that Section 1502 and the Final Rule impose—the fact that, in some cases, companies must characterize their products as "not having been found to be 'DRC conflict free.'"  In Plaintiffs' view, "[t]he compelled disclosure is intended to serve as a 'scarlet letter.'"  (Pls.' Brief at 52).  But considering the manner in which Congress and the Commission implemented this requirement, the nature of the product-specific disclosures, in particular, is reasonable and proportionate.  For one, this description must be made, if at all, in the body of a Conflict Minerals Report, not through some standalone, conspicuous disclosure, as discussed above.  Even then, issuers remain free to include whatever additional clarification or explanation they deem necessary.  77 Fed. Reg. at 56,322.  For example, companies can include the statutory definition of "DRC conflict free," to highlight its specific meaning under the Final Rule, and they can add any relevant information concerning their sourcing practices and supply chains they believe places the disclosure in accurate context.

Moreover, in response to some of the very same "scarlet letter" and "unfair stigma" concerns Plaintiffs raise here, the Commission revised the required language during the rulemaking process; rather than describing products as "not 'DRC conflict free,'" as originally proposed, the Final Rule requires issuers to describe such products as having "not been found to

---

[30]     Relatedly, Plaintiffs' contention that "the government could pursue political or diplomatic means" to promote peace and security in the DRC does nothing to undermine the reasonableness of the disclosure scheme Congress saw fit to implement.  (*See* Pls.' Brief at 54).  While undoubtedly true that diplomatic efforts may also advance Congress's goals—and, indeed, the Court notes that the State Department is actively engaged in the DRC conflict already—it does not follow that the disclosure scheme is an unreasonable fit as part of the United States' comprehensive approach.

be 'DRC conflict free.'" *Id.* Additionally, the Final Rule's temporary phase-in periods mitigate and offset some of these concerns by permitting companies to describe products containing necessary conflict minerals from an undetermined source as "DRC conflict undeterminable" during the first few years of the Rule's implementation. *Id.* This approach virtually eliminates the risk that disclosures "will frequently be false," as Plaintiffs suggest, insofar as the statements "not been found to be 'DRC conflict free'" and "DRC conflict undeterminable" do not amount to a declaration that the issuer's minerals were definitively found to have assisted in financing the conflict. Furthermore, the phase-in periods provide several additional years for companies to trace their supply chains and to more accurately determine the source of their conflict minerals. Taking all of these elements of the disclosure scheme together, the Court finds a "reasonable fit" between the relevant provisions of Section 1502 and the Final Rule and Congress's objectives in promoting peace and security in and around the DRC.

In sum, the Court concludes that the conflict minerals disclosure scheme that Plaintiffs challenge passes muster under *Central Hudson* intermediate scrutiny, which means that Plaintiffs' claim under the First Amendment fails.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court concludes that Plaintiffs' Motion for Summary Judgment must be **DENIED**, and that the Commission's and Intervenors' Cross-Motions for Summary Judgment must be **GRANTED**. An appropriate Order accompanies this Memorandum Opinion.

Date: July 23, 2013

_____
ROBERT L. WILKINS
United States District Judge